OPINION OF THE COURT
Harold J. Rothwax, J.
The defendant has been indicted and charged with grand larceny (Penal Law §§ 155.42, 155.40 [1]; § 155.35), grand larceny by extortion (Penal Law § 155.40 [1], [2]), money laundering (Penal Law § 470.10 [1], [2]), and intimidating a witness (Penal Law § 215.15 [1]).
THE EVIDENCE
McCormack International, a London based company, was hired as general contractor to renovate the Tudor Hotel on the east side of Manhattan, at an initial cost of about $20,000,000. The principal officers of McCormack International were Sean McCormack and his son, Peter McCormack, who oversaw the renovation and handled the finances. McCormack International began work sometime in August of 1989. The defendant Capparelli initially was hired to perform carting services for the construction site and as such was one of the first subcontractors on the site.
Initially, Capparelli offered to take care of the McCormack’s labor "problems” by using his "connections” to enable the McCormacks to employ their own nonunion workers in the renovation, in addition to union workers brought on by subcontractors. Until that time, the McCormacks had no labor problems and, in fact, had not hired the subcontractors or met with any union officials. The McCormacks were aware that the previous general contractor had been forced to close down the Tudor renovation by violent labor unrest relating to the use of nonunion workers. Capparelli told the McCormacks that he had been assigned the job of supervising the arrangement of labor used in the renovation. Capparelli instructed the McCormacks to watch a fictional movie about an orga *999 nized crime family, so that they would "understand”. Capparelli informed the McCormacks that he was "in the movie” and that the movie depicted his "family”. Capparelli told the McCormacks that they "had to make things right with the people in New York”, and that the way around the unions lead through Tony Pagano, a labor official. According to Capparelli, periodic payments to Pagano and others through Capparelli would "solve” the labor "problem”. The defendant introduced the McCormacks to Pagano, instructing them that money would not be discussed. Capparelli also suggested that the McCormacks give Pagano’s son the $1.6 million contract for drywall construction in the hotel. The son received the drywall contract, which he in turn subcontracted to a company in which Capparelli was a partner.
Capparelli extended his influence over the hiring of other subcontractors. Of the 14 subcontractors used in the renovation, 10 were hired upon Capparelli’s recommendation. Capparelli informed the McCormacks that if they employed the subcontractors Capparelli suggested, because of his "connections” he could make "things run very smoothly”. As to other subcontractors the McCormacks hired, Capparelli warned that the McCormacks "would get problems” with labor relations. Capparelli told the McCormacks’ construction foreman that the McCormacks "would have to pay” for using subcontractors other than those he suggested.
At a general meeting of subcontractors to set the renovation schedule, union business agents representing each of the dozen trades involved in the renovation appeared. Capparelli spoke with the agents, who then introduced themselves individually to the McCormacks’ foreman and left the site. None of them ever reappeared.
The McCormacks began making weekly cash payments to Capparelli to ensure labor peace. These payments continued throughout the entire period McCormack International conducted the renovation. Capparelli collected hundreds of thousands of dollars in cash from the McCormacks over the period from September 1989 through April 1991.
As the work progressed, the defendant’s threats became more explicit as the defendant’s demands escalated. About six months into the contract, the defendant warned the McCormacks that if they revealed his organized crime ties "the consequences could be fatal”. The defendant gave Peter McCormack one half of a $100 bill and told him that if he ever *1000 received the other half he had better "run forever” because Capparelli would find him and kill him, "wherever you go”.
In June 1990 Capparelli approached the McCormacks with $400,000, in $100 denominations, and instructed them to write two checks to a Capparelli company, PT Estates, to cover the cash. Capparelli stated that the purpose of the transaction was to enable him to write checks for the down payment on a house he had purchased in Queens. The money was subsequently paid by PT Estates to Capparelli. Capparelli also suggested that the cash on hand would facilitate the McCormacks’ payments to the "boys downtown”.
The house Capparelli purchased was renovated, largely by subcontractors employed in the Tudor renovation. This was accomplished by various coercive means. For example, when the McCormacks’ foreman disputed a $15,000 bill for labor on Capparelli’s house, submitted to McCormack International, Capparelli threatened to kill him. McCormack International paid the bill. McCormack International also provided windows, doors, carpentry materials and labor. Many of the subcontractors employed in the Tudor renovation supplied material and labor for the house, without ever receiving reimbursement from Capparelli or from McCormack International. The total value of the renovation exceeded $1,000,000, and was not completed until the fall of 1991.
In August 1990 as part of the payment to Capparelli for labor peace, Capparelli directed the McCormacks to open a bank account in his wife’s name in Northern Ireland and to deposit $50,000 into the account. Capparelli had his wife complete the signature card for the account. The money was transferred at the McCormacks’ direction. However, when the bank informed the McCormacks and through them, Capparelli, that Irish law required Capparelli’s wife to appear in person to open the account, the defendant instructed the McCormacks to "get rid of’ the account. Consequently, the money on account was never available for use by Capparelli or his wife.
Ultimately, the defendant demanded that the McCormacks relinquish the general contract for the Tudor renovation. McCormack International and the owners of the hotel began to have differences over the cost of the renovation. In January 1991 with the project 75% completed, the owners stopped payment on their weekly check to the general contractor. This put McCormack International in danger of bankruptcy. The *1001 company stopped work and put a construction lien on the hotel. The dispute lasted nine weeks. During this period, Capparelli informed the McCormacks that he wanted to take over the contract and that it was time the McCormacks left New York. Capparelli informed Sean McCormack that the subcontractors had decided they would prefer to work for Capparelli. In early April 1991, the McCormacks entered into a new agreement with the owners and attempted to restart the renovation. When he learned that McCormack International would continue the work, Capparelli and two men went to Sean McCormack’s office in the hotel where Capparelli assaulted McCormack, threatened his life and the lives of his family, and demanded that the McCormacks leave New York and abandon the contract. During the following week Capparelli assaulted Sean McCormack on a number of occasions, and repeated his threats to kill the McCormacks. During that week, only a few of the subcontractors’ workers appeared at the job site. At the end of the week, when Capparelli did not get his weekly cash payment, he told Peter McCormack that "tomorrow morning you will not see daylight”. McCormack paid Capparelli out of the payroll. When the foreman sought the assistance of the owners’ agent in New York, the agent informed Capparelli, Capparelli then ordered McCormacks’ foreman to remove McCormack International’s workers from the site and told him that if he did not comply he would be dead by the next evening. No work was done the next day. During meetings that day with Sean McCormack and the foreman, Capparelli told McCormack that he had been asked to "run [McCormack] out”. Capparelli told the foreman that Capparelli would run the job. On Monday, the McCormacks continued to try to fulfill their contract. Capparelli continued his threats. By the middle of the week, it became clear that the owners’ agent would not issue the weekly check. When Sean McCormack walked in on a meeting between Capparelli and the owners’ New York agent, and heard Capparelli repeat that he would kill McCormack, the McCormacks withdrew their workers and left New York.
McCormack International was immediately replaced by Tony Pagano, Jr.’s company. Using all of the same subcontractors, Pagano managed the site for four months. In September 1991 Pagano’s company was replaced by another general contractor, recommended by Capparelli. The new general contractor, Gabe Construction, employed Capparelli’s son at a *1002 salary of $3,400 weekly and agreed to pay him half of the profits from the contract.
After the McCormacks left New York and returned to London, they filed a civil RICO suit in the Federal District Court for the Southern District of New York, in Manhattan, naming Capparelli and the owners’ New York agent as defendants. When Capparelli learned of the suit, he met in Queens with one Charlie Rogers, a previous employee of the McCormacks who was from Ireland. Capparelli recorded the conversation, and the tape was received in evidence before the Grand Jury. On the tape, Capparelli expressed concern about the "DA” and the FBI. Rogers noted that if McCormack returned to New York "to testify against all youse right, he’s gonna have so much protection you wouldn’t even f_ near him”. Capparelli agreed, noting that the "FBI’s gonna bring him out”. Capparelli told Rogers that they had to get Sean McCormack "to stop what he’s doing, because if you don’t there’s gonna be a serious problem for everybody”. Capparelli told Rogers that McCormack was "a rat”. Rogers replied that "there’s ways of closing a rat. And McCormack will back off, if you put him up to that”, but that "the threats have to come from the right people”. Rogers then agreed to have someone in Ireland from the IRA "reach out” to McCormack, in exchange for "a contribution” from Capparelli. Rogers made a call to Ireland. Sean McCormack, in England, received four phone calls. One caller identified himself as a friend of Capparelli’s and said that it was "time we sorted out the problems”. The other three callers threatened McCormack’s life if he should return to New York.
EXTORTION
Initially the defendant demanded periodic cash payments from the McCormacks in exchange for a guarantee of labor peace. The defendant backed up his demand by demonstrating his apparent influence over union business agents assigned to monitor the project, and his boasts of organized crime affiliation. In fact, the defendant told the McCormacks that part of the cash was for his organized crime associates, to make sure the job "ran smoothly”. The principals of McCormack International testified that they believed these representations and that they were thereby initially induced to pay the defendant out of fear of economic harm. The court finds this evidence sufficient to establish that the victims in fact *1003 feared Capparelli. (Cf., People v Raff a, 90 Misc 2d 97 [Nassau County Ct 1976].) The court also finds that the Grand Jury was justified in concluding that this fear of economic harm was credible (see, e.g., People v Dioguardi, 8 NY2d 260, 268 [1960]; and see, United States v Salerno, 868 F2d 524, 530-531 [2d Cir 1989]),[1] particularly in light of the previous violent labor unrest resulting in closing down the renovation of the same building by another contractor. Although there is no evidence connecting the defendant to the previous work stoppage, which was directed against another contractor in any event, the Grand Jury could infer from the defendant’s offer to "take care of the labor problem” through his "connections”, that the defendant was aware the McCormacks knew of the prior labor difficulties, and intentionally instilled fear of future labor difficulties in order to exact payments of money from them. (See, e.g., United States v Duhon, 565 F2d 345, 351, 353 [5th Cir 1978]; Callanan v United States, 223 F2d 171, 175 [8th Cir 1955]; United States v Palmiotti, 254 F2d 491, 495-496 [2d Cir 1958].) In addition, the McCormacks had reason to fear Capparelli’s influence over the subcontractors who had been hired through Capparelli’s intervention. This fear was apparently justified when the McCormacks were unable to restart the renovation over Capparelli’s objection in April 1991. Fear of future economic harm is sufficient to establish extortion under the statute. (People v Dioguardi, 8 NY2d 260, 268 [1960]; People v Spatarella, 34 NY2d 157, 161-162 [1974], supra; and see, Callanan v United States, supra.)
The McCormacks used some nonunion labor on the Tudor job, and the Grand Jury was so informed. However, the presence of nonunion laborers did not confer any legitimacy upon the defendant’s demand for payments of money in exchange for labor peace. (See, e.g., United States v Gibson, 726 F2d 869 [1st Cir 1984]; United States v Duhon, 565 F2d 345, 353, supra.) There is nothing to indicate that the money was for a legitimate purpose or benefited any union. The defendant was not even a union official. In this regard, the court notes that Capparelli’s apparent influence over the *1004 unions as evidenced by Capparelli’s arranging a meeting with Tony Pagano, Sr., followed by the disappearance of business agents from the site after speaking with Capparelli, was a sufficient basis for the Grand Jury to credit the victims’ testimony that they believed Capparelli could cause the economic harm he threatened. Larceny by extortion does not require evidence of an actual ability to cause the threatened harm in the threatened manner, only that the person threatened believed the defendant possessed such an ability. (See, United States v Rastelli, 551 F2d 902, 905 [2d Cir 1977]; United States v Varlack, 225 F2d 665, 668 [2d Cir 1955]; United States v Palmiotti, supra, 254 F2d, at 496.)
Ultimately, Capparelli’s threats forced the McCormacks to abandon their newly restructured contract to complete the renovation of the hotel. The contract was the property of McCormack International, of which McCormack International was capable of being deprived within the meaning of the Penal Law. (Penal Law § 155.00 [1]; People v Spatarella, 34 NY2d 157, supra.) The evidence, viewed most favorably to the indictment, showed that Capparelli deprived McCormack International of the benefit of the contract by compelling the principals of the corporation to abandon it, and thereafter appropriated the contract for the benefit of others, including his son. Insofar as this was accomplished by direct threats of bodily harm and/or death to the McCormacks, the evidence establishes larceny by extortion (People v Spatarella, supra). In this connection, the court notes that evidence of the defendant’s assaults, reputation for violence and of his self-proclaimed ties to organized crime was properly admitted as contributing to the credibility of his threats and of the victims’ fear that they would be realized. (See, e.g., United States v Salerno, supra, 868 F2d, at 531; United States v Stubbs, 476 F2d 626, 627-628 [6th Cir 1973]; People v Billingsley, 474 F2d 63, 65-66 [6th Cir 1973].)
Part of Capparelli’s coercive influence over the general contractor included the representation that labor "peace” required the use of subcontractors whom he chose, so that Capparelli could control them. Having attained this influence, Capparelli was able to use it to extort property from subcontractors who participated in the renovation. Capparelli indicated to subcontractors that he had the power to deliver contracts, which clearly implied the power to withhold a contract if the subcontractor failed to comply with Capparelli’s demands. (People v Dioguardi, supra, 8 NY2d, at 272.) The *1005 Grand Jury was entitled to credit the subcontractors’ testimony that they complied out of fear that their bids would be rejected. (See, e.g., United States v Hathaway, 534 F2d 386, 395 [1st Cir 1976].) In most instances, Capparelli received the benefit of a portion of the subcontractor’s contract, either directly, in the form of payments of money, or indirectly, in the form of work done and material supplied by the subcontractor for Capparelli’s house. To the extent that these arrangements were motivated by the subcontractor’s fear that failure to comply would result in denial of their bid for a Tudor contract, this fear was sufficient to establish extortion, given the evidence before the Grand Jury. (People v Kacer, 113 Misc 2d 338, 346-347 [Sup Ct, NY County 1982], supra; see, e.g., United States v Brecht, 540 F2d 45, 52 [2d Cir 1976]; United States v Addonizio, 451 F2d 49, 72-73 [3d Cir 1971].) Thereafter, by virtue of Capparelli’s continuing influence over the general contractor, the subcontractors credibly feared that Capparelli could cause them economic harm by interfering with their contracts, if they did not comply with his demands for labor and material in connection with the renovation of his house. (See, United States v Daley, 564 F2d 645, 650 [2d Cir 1977].)
In one instance, however, the subcontractor performed work on Capparelli’s house at the direction of the general contractor and upon the general contractor’s promise to pay for the work. This conduct was motivated by expectation of profit, and not by fear that Capparelli would interfere with his contract. (See, e.g., United States v Garcia, 907 F2d 380 [2d Cir 1990].) Moreover, the general contractor hired this subcontractor without Capparelli’s influence. To the extent that the general contractor was motivated by fear of Capparelli to instruct the subcontractor to work on the renovation of Capparelli’s house, this conduct is covered in other counts of the indictment. To the extent that the subcontractor’s conduct was motivated by Capparelli’s general reputation, this evidence is insufficient to establish extortion, in the absence of any evidence of implicit threats by Capparelli to harm the business or person of the subcontractor. Moreover, the evidence in regard to this subcontractor does not support any other theory of larceny. The evidence fails to support an inference that the work was induced by any promise on the defendant’s part (cf., People v Churchill, 47 NY2d 151, 156 [1979]) or by any misrepresentation of fact. Therefore, these counts of the indictment are dismissed.
*1006 GRAND LARCENY
The first count of the indictment charges the defendant with grand larceny in the first degree (Penal Law § 155.42) based upon the value of the balance of the Tudor renovation contract as of April 1991 when the McCormacks were forced to abandon the project. The expert testimony as to the value of the contract was sufficient to establish that the contract was worth in excess of $1,000,000. However, the bill of particulars clearly indicates with respect to this count that the People’s sole theory of larceny was extortion. The court fails to allege that the larceny was committed by extortion.
Section 155.45 of the Penal Law states that "[w]here it is an element of the crime charged that property was taken from the person or obtained by extortion, an indictment for larceny must so specify. In all other cases, an indictment * * * for larceny is sufficient if it alleges that the defendant stole property of the nature or value required for the commission of the crime charged without designating the particular way or manner in which such property was stolen or the particular theory of larceny involved.” The second sentence in this section was derived from former Penal Law § 1290-a, which simplified the pleading and proof requirements for larceny. In substance, the revision allowed the prosecutor to plead larceny without designating the particular common-law form of larceny involved. The statute also permitted a charge of larceny to be supported by evidence of larceny in any form recognized at common law. (People v Johnson, 39 NY2d 364, 369.) An indictment charging larceny by extortion may not be supported by evidence of larceny by other means. (Penal Law § 155.45 [2].)
It is clear that where the People have relied upon a theory of larceny by extortion under those sections of the Penal Law which expressly include extortion as part of the definition of the offense (Penal Law § 155.30 [6]; § 155.40 [2]), failure specifically to plead extortion requires dismissal of that count of the indictment. (People v Thompson, 80 AD2d 867 [2d Dept 1981].) As to these sections, it is also clear that evidence of larceny by extortion will not support a charge of larceny pleaded generally. (People v Robert YY, 58 AD2d 920, 921 [3d Dept 1977].) The People apparently assume that where extortion is not part of the definition of the crime, the provisions of Penal Law § 155.45 regarding extortion do not apply. The People apparently rely upon the term "element” in Penal Law § 155.45 (1).
*1007 The term "element” is not defined in the Penal Law. However, the crime of larceny continues to be defined by reference to those forms recognized at common law, and those specifically adopted by statute. (Penal Law § 155.05; People v Foster, 73 NY2d 596, 604-605 [1989].) Any prosecution for larceny must satisfy the elements of proof of one of those forms. Where the theory of prosecution is larceny by extortion, proof that the defendant compelled or induced another to part with property by instilling fear of future injury is necessary. (Penal Law § 155.05 [2] [e].) In other words, in any such prosecution, extortion is a necessary element of the proof.
Since every indictment must contain a concise statement of fact supporting every element of the offense charged (CPL 200.50 [7] [a]), in cases where the People rely upon a larceny section which includes extortion in the definition of the offense, extortion necessarily would have to be alleged. Penal Law § 155.45 (1) has meaning only where the value of the property would allow indictment under a larceny section which does not include extortion within the statutory definition, but where the evidence establishes larceny by extortion (Penal Law § 155.05 [2] [e]). However, under the People’s approach to pleading adopted in this indictment, it is precisely in those cases that the People could avoid pleading extortion. By not having to plead extortion in such cases, the People would not be limited by Penal Law § 155.45 (2) to proving larceny by extortion, but could prove the larceny by any means including extortion. Therefore, whether the People could avoid the limitation of Penal Law § 155.45 (2) would depend upon the value of the property, and not upon the theory of the case. This leads to the further anomalous result that in cases where the value of the property stolen by threats of future physical harm exceeds $50,000, the People might plead grand larceny in the second degree twice, under each subdivision of Penal Law § 155.40, even though only one crime had been committed. Since extortion of property of any value is grand larceny in the second degree, and since extortion would be the only theory of larceny supported by the evidence, such counts would be multiplicitous. In the court’s view, this was not the Legislature’s intent.
It appears to the court that the Legislature by adopting these special rules of pleading and proof in regard to extortion, simply acknowledged the separate origin of the crime of extortion apart from the common-law crime of larceny. Under the former Penal Law, extortion was a crime separate and *1008 apart from larceny (former Penal Law §§ 850, 851). Extortion involves special problems of proof, and is more akin to robbery than to other forms of larceny. (See, People v Woods, 50 AD2d 941, 942 [2d Dept 1975] [dissenting opn, Cohalan, J.]; former Penal Law § 2120.) Upon enactment of the revised Penal Law, the crimes of extortion and larceny were merged. (See, Denzer and McQuillan, Practice Commentary, McKinney’s Con Laws of NY, Book 39 [1967], Penal Law former § 155.40, at 458.) The previously recognized common-law forms of larceny and the statutory crime of extortion were incorporated into the revised Penal Law as larceny. (See, Penal Law § 155.05 [2].) Extortion became the most severely punished form of grand larceny. (Penal Law former § 155.40.)[2] The revisers of the Penal Law believed that including extortion within larceny was a "somewhat novel arrangement”. (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law art 155, at 103.) Since extortion was not larceny at common law, former Penal Law § 1290-a did not encompass charges of extortion. Therefore, under this predecessor to revised Penal Law § 155.45, an indictment for extortion necessarily would have specifically pleaded the separate statutes. The revisers of the Penal Law simply maintained a vestige of the historical separation between these crimes, by requiring that "[w]here it is an element of the crime charged that property was * * * obtained by extortion, an indictment for larceny must so specify” (Penal Law § 155.45 [1]). In the court’s view, this legislative history indicates an intent to continue to require special pleading as to any indictment upon evidence which would have constituted the crime of extortion under the former Penal Law.
Although this court is unaware of any other cases which have so held, other courts have assumed that Penal Law § 155.45 applies to prosecutions where the grand larceny charged does not include extortion within the definition of the offense. (People v Woods, 50 AD2d, supra, at 941-942 [Cohalan, J., dissenting] ["We consider the dismissal of the larceny counts to have been erroneous. The larceny committed in this *1009 case was not larceny by extortion, which must be specifically pleaded (Penal Law, § 155.45), but a common-law larceny by trick or by false pretenses and the indictment sufficiently pleaded that crime (Penal Law, § 155.05)” (emphasis added)]; see also, People v Schwenk, 92 Misc 2d 331, 335 [Suffolk County Ct 1977]; People v Silverman, 106 Misc 2d 468, 469 [Sup Ct, NY County 1980] [assuming that Penal Law § 155.45 applies to prosecutions under Penal Law § 155.35].)
Accordingly, the count is dismissed for failure to allege larceny by extortion.
MONEY LAUNDERING
The defendant is charged in six counts with money laundering in the second degree (Penal Law § 470.10). The elements of this crime are that the defendant:
1. exchange or receive in exchange, in one or more transactions;
2. one or more monetary instruments which are the proceeds of specified criminal conduct and have a total value exceeding $10,000;
3. for one or more other monetary instruments and/or equivalent property;
4. when the defendant knows that the monetary instruments or instruments exchanged or received in exchange are the proceeds of any criminal conduct and;
5. (a) intentionally makes the change to conceal or disguise the nature, the location, the source, the ownership, or the control of such proceeds; or
5. (b) intentionally makes the exchange to aid himself or another person to commit or profit or benefit from specified criminal conduct; or
5. (c) knows the exchange will conceal or disguise proceeds from the criminal sale of a controlled substance.
Three counts allege that the defendant intentionally made the exchange to conceal and disguise the nature and source of the proceeds. The other three counts allege that the defendant intentionally made the exchange to aid himself and another person to commit and profit and benefit from specified criminal conduct.
With regard to the first three counts, testimony before the Grand Jury established that Capparelli approached the Mc-Cormacks on two dates in June 1990 with large amounts of *1010 cash. He produced $300,000 on the first occasion and $100,000 on the second occasion, all in $100 bills. One of the principals of McCormack International testified that the cash "came from us”. Capparelli demanded that the McCormacks write checks on McCormack International accounts payable to a Capparelli company. The Capparelli company had no business relationship with the McCormacks or with McCormack International. The evidence showed that Capparelli deposited the checks and was issued a check for $400,000 on the company account, payable to Capparelli. At the time he exchanged the cash for the McCormack International checks, Capparelli stated that he needed checks that the bank would accept as down payment on the Queens house. Capparelli also stated that the cash would facilitate payments by the McCormacks for labor peace.
This evidence suffices to establish all of the elements of the crime charged. Currency and bank checks are monetary instruments within the statute. (Penal Law § 470.00 [1].) Grand Larceny is among the "[specified criminal conduct” which generates proceeds within the meaning of the statute. (Penal Law § 470.00 [5]; § 460.10 [1] [a].) The Grand Jury could credit the testimony that the $400,000 in cash was the product of the previous eight months of cash payments to Capparelli by the victims of his extortion. This testimony was supported by the nature of the transaction. The large amount of cash in small denominations, converted to checks for the purpose of creating a legitimate use of the funds, combined with proof of contemporaneous "specified” criminal conduct which generated an equivalently large amount of cash, supports the inference that the cash was the proceeds of the specified criminal conduct. (See, e.g., United States v Blackman, 904 F2d 1250, 1257 [8th Cir 1990]; United States v Ramirez, 954 F2d 1035, 1039 [5th Cir 1992].) While the preferred procedure where the proceeds are cash may be to account for the defendant’s legitimate sources of income in order to demonstrate their inadequacy to generate an equivalent amount of cash (see, e.g., United States v Blackman, supra, 904 F2d, at 1257; United States v Webster, 960 F2d 1301, 1308 [5th Cir 1992]), at the Grand Jury stage, drawing only those inferences favorable to the Grand Jury’s finding of reasonable cause (see, e.g., People v Ballou, 121 AD2d 861, 862 [1st Dept 1986]) the amount of cash and contemporaneous specified criminal conduct supports the conclusion that the cash exchanged was that received over time from the extortion.
*1011 Moreover, the evidence sufficed to establish Capparelli’s intent to conceal and disguise the nature and source of the funds as the product of extortion. (Penal Law § 470.10 [1].) The use of checks from McCormack International payable to a Capparelli company disguised the nature of the proceeds as a large denomination of $100 bills. Moreover, the Grand Jury could fairly infer that Capparelli used the checks to create the appearance of a legitimate expenditure by McCormack International to a Capparelli company, in order to conceal from anyone who might subsequently investigate, that the source of the funds was criminal. (See, United States v Jackson, 935 F2d 832, 840 [7th Cir 1991] [construing 18 USC § 1956 (a) (1) (B) (i) which also requires proof that the transaction was designed to conceal "the nature, the location, the source, the ownership, or the control” of proceeds of specified criminal conduct].) Accordingly, the counts are sustained.
Capparelli’s stated purpose in obtaining these checks was to make a down payment on the Queens house. With the aid of the checks, Capparelli was able to purchase the house, enabling Capparelli to benefit from the extortion by investing the cash derived from that crime and further aiding Capparelli to commit and profit from that crime by providing opportunity for the use of labor and materials extorted from McCormack International and its subcontractors on the Tudor project. (Penal Law § 470.10 [2]; see, e.g., United States v Saget, 991 F2d 702, 712 [11th Cir 1993].) It is important to note that the purchase of the house with the proceeds of the crime is not money laundering under our statute, since real estate is not "[equivalent property” as defined by section 470.00 (2). The purchase of the house is relevant only insofar as it proved that the defendant’s intent in converting the cash to checks, was to enable him to benefit from the proceeds of the crime, and to facilitate its commission. (See, e.g., United States v Montoya, 945 F2d 1068, 1076 [9th Cir 1991] [applying 18 USC § 1956 (a) (1) (A) (i) defendant’s deposit of bribe check sufficed under statute requiring proof that defendant engaged in the transaction with " 'inten(t) to promote the carrying on of specified unlawful activity’ ”].) Accordingly, these counts are sustained.
The remaining counts of money laundering in the second degree are based upon the defendant’s demand that McCormack International deposit $50,000 in an Irish bank account in his wife’s name. This deposit, according to the victims of *1012 the extortion, was a direct result of Capparelli’s threats. Credit in an account in a financial institution is a form of "[equivalent property” (Penal Law § 470.00 [2]), and a deposit of money into a bank account is a "[transaction” (Penal Law § 470.00 [3]) within the meaning of the statute. However, not every transaction involving the proceeds of specified criminal conduct is money laundering. (See, e.g., United States v Sanders, 928 F2d 940, 944-947 [10th Cir 1991].) The evidence must establish that the transaction involved an "exchange” of proceeds of criminal conduct for other monetary instruments or equivalent property. Had the defendant attempted to withdraw these funds, the withdrawal would have constituted a "[t]ransaction” (Penal Law § 470.00 [3]) in which the proceeds were exchanged, and would have established money laundering. (See, e.g., United States v Jackson, supra, 935 F2d, at 841.) Here, the $50,000 deposit was the product of the crime. Accordingly, only the first part of the required exchange occurred. Nonetheless, the evidence justifies the inference that the defendant intended by this deposit in his wife’s name, to conceal the source of this money and to benefit from his extortion. Only the further requirement of his wife’s personal presence to complete forms, prevented culmination of the exchange. Since the evidence showed that the McCormacks’ deposit of the $50,000 put it within the defendant’s power to complete the exchange, which he apparently failed to do only out of fear of detection, these counts are reduced to an attempt to commit money laundering in the second degree. (People v Mahboubian, 74 NY2d 174, 191-192 [1989].)
INTIMIDATING A WITNESS AND CRIMINAL SOLICITATION
The count of intimidating a witness in the third degree (Penal Law § 215.15 [1]) is sustained.
The evidence was sufficient to establish particular effect jurisdiction in New York County, although the solicitation occurred in Queens County. CPL 20.40 (2) (c) confers jurisdiction upon the courts of any county where, "[e]yen though none of the conduct constituting such offense may have occurred within such county: * * * [s]uch conduct had, or was likely to have, a particular effect upon such county or a political subdivision or part thereof, and was performed with intent that it would, or with knowledge that it was likely to, have such particular effect”. A "particular effect” within the county is defined as a "materially harmful impact upon the govern *1013 mental processes or community welfare of’ the county seeking to assert jurisdiction. (CPL 20.10 [4].)
In People v Griffen (121 Misc 2d 1068 [Sup Ct, NY County 1983]), the court found that New York County had jurisdiction over a prosecution for tampering with a witness, predicated on an assault in Bronx County upon a witness for the purpose of intimidating the witness from testifying in a murder prosecution pending in New York County. The court noted that the assault was intended and likely to have a materially harmful effect upon the judicial processes and community welfare of New York County. The instant prosecution is one step removed from that at issue in Griffen, since at the time of the defendant’s acts no prosecution, or indeed, criminal investigation, was pending. However, the reasoning of Griffen is no less persuasive simply because the defendant anticipates and attempts to thwart the prosecution before it occurs. It is the intended effect of the defendant’s conduct that warrants the exercise of jurisdiction by the courts of New York County.
In Matter of Steingut v Gold (42 NY2d 311, 318 [1977]) the defendants allegedly offered, in New York County, to confer a benefit upon a campaign contributor in exchange for raising funds for the election of one of the defendants to a Kings County office. The Court of Appeals held the impact upon Kings County to be "nebulous”. Unlike Steingut, the injury likely to result from the defendant’s conduct was localized, perceptible and demonstrable. Intimidating McCormack from communicating information regarding the defendant’s crimes would have thwarted the criminal justice processes of New York County in particular.
The County of New York, in particular, had jurisdiction over the criminal acts that the defendant sought to conceal through intimidation. The defendant’s crimes occurred in New York County. The defendant’s criminal conduct had a concrete, perceptible and harmful impact upon a construction project situated in New York County. The defendant’s threats and assaults by which he engaged in extortion occurred in New York County. He obtained money from that extortion, and exchanged money which was the product of that extortion, in New York County. Consequently, within the State of New York, the criminal conduct that McCormack threatened to reveal, was of particular and demonstrable concern to law enforcement agencies of New York County in particular. The fact that Federal authorities might also have been interested in Capparelli’s crimes does not lessen the impact upon this *1014 county’s government, since the county and Federal governments may exercise concurrent jurisdiction over the same criminal acts. Moreover, the defendant’s attempt, in Queens County to thwart the investigation of these crimes, had a greater impact upon the County of New York than upon the County of Queens. (Matter of Steingut v Gold, supra, at 317.) For these reasons, the court finds the exercise of particular effect jurisdiction appropriate. (See, State v Hook, 433 SW2d 41, 47 [Mo App 1968].) The grand jurors were charged appropriately on the law of particular effect jurisdiction.

. New York appellate courts frequently refer to Federal cases interpreting the Hobbs Act (18 USC § 1951) which was based upon the former New York extortion statute (see, People v Kacer, 113 Misc 2d 338, 346, n 2 [Sup Ct, NY County 1982]), and to New York cases interpreting the former extortion statute (former Penal Law § 850), for guidance in interpreting Penal Law § 155.05 (2) (e). (See, e.g., People v Forde, 153 AD2d 466, 471-473 [1st Dept 1990]; People v Spatarella, 34 NY2d 157 [1974].)

. Since under the original statutory scheme, no greater degree of larceny could be committed than that committed by extortion, the prosecution had no incentive to frame a charge of grand larceny by extortion based solely upon the value of the property. In 1986, the Penal Law was amended to include a degree of larceny based upon the value of the stolen property exceeding $1,000,000 (Penal Law § 155.42, L 1986, ch 515, § 3), which exceeded larceny by extortion in the severity of punishment available.