**KRAFT GENERAL FOODS, INC., Plaintiff,**

v.

**Claudia CATTELL, Prographics One of Valhalla, Inc., Prographics II, Joseph DeVito, John Does 1, 2, 3, 4 and 5, Defendants.**

No. 93 Civ. 6858(WCC).

United States District Court, S.D. New York.

Aug. 3, 1998.

Bleakley Platt & Schmidt, White Plains, New York, (Timothy P. Coon, Robert D. Meade, of counsel), for plaintiff.

Fabricant & Yeskoo, LLP, New York City (Richard C. Yeskoo, of counsel), for defendants Prographics II and Joseph DeVito.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Kraft General Foods, Inc. ("Kraft") brings this action against defendants Claudia Cattell, Prographics One of Valhalla, Inc. ("Prographics I"), Prographics II, Joseph DeVito, and John Does 1, 2, 3, 4, and 5, alleging breach of contract, breach of fiduciary duty, unjust enrichment and various acts of common law fraud. The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332. Plaintiff now moves for partial summary judgment against defendants DeVito and Prographics II with respect to the claims for unjust enrichment, breach of fiduciary duty and common law fraud. For the reasons that follow, plaintiff's motion is denied.

## Background

In 1993, plaintiff commenced this action against defendants, alleging that DeVito, graphics designer and owner of design studios Prographics I and II, Cattell, former Senior Design Manager for Kraft, and others had stolen more than $6 million dollars from it between 1988 and 1993, through overcharges for graphics designs used in packaging its products, for example on boxes for children's cereals.

In 1995, after discovery in this action was nearly complete, Kraft reported DeVito and Cattell to the Westchester County District Attorney. DeVito was charged with commercial bribery and grand larceny in the first degree and tried in Westchester County Supreme Court. At his trial, DeVito's defense was that he had not bribed Cattell but that she had extorted money from him. Cattell, who had pled guilty to grand larceny in 1996, was the State's principal witness against him. On July 30, 1997, DeVito was acquitted on both counts.

In August 1995, pursuant to a settlement agreement with Cattell, Cattell and the "John Doe" defendants were dismissed from the action. In June 1998, Kraft moved for partial summary judgment against DeVito and Prographics II. The motion was stayed until July 1998, pending transcription of the criminal trial proceedings against DeVito.

Kraft, relying on Cattell's testimony from the criminal proceedings against DeVito, alleges the following. DeVito was the sole provider of graphic design services for its Honeycomb, Alpha–Bits and Pebbles cereals from 1988–1993. Pl.'s Rule 56.1 Stmt. at ¶ 7 (citing Cattell Direct at 406). During this period, DeVito and Cattell engaged in a complex kickback scheme, by which Cattell would set a budget for DeVito's projects based upon her estimate of the amount of work required, and submit these budgets to Kraft product managers for approval. DeVito would then prepare invoices in the amount of the approved budgets. The amounts of the budgets allegedly included an amount that DeVito had agreed to pay Cattell through a shell company called "Creative Pencil" and an amount representing DeVito's overcharge. According to Kraft, DeVito would give Cattell money, through Creative Pencil, in order to secure additional projects from Kraft. *See id.* at ¶ 12. Cattell did not inform Kraft that the budgets included payments to DeVito and herself. On every project awarded to DeVito, Cattell was paid monies, in most cases between 30–33% of the invoice, for a total of $3.2 million over a five-year period. This does not include $3 million in profit, *id.* at ¶ 14, which DeVito made on his work for Kraft and which he used, *inter*

*alia*, to refurbish his beach house, and to buy a Porsche.

DeVito paints a different version of events. According to DeVito, he paid Cattell money in response to her threats to put him out of business, in order to prevent his companies from going bankrupt, to make payments on his house and to support his wife and child. He claims that gradually, over time, Cattell forced him to become dependent on Kraft's business, and her relationship with Kraft. He offers the following facts in support of his account.

DeVito began providing designs to Kraft in November 1987, after one of its regular designers had broken his nose and could not complete a project for Kraft's "Birds-eye" product line. DeVito Direct at 1694. Cattell approached DeVito with a "rush job" for the Birds-eye product, to be completed over Thanksgiving weekend. *Id.* Kraft paid DeVito $3,000 for the job, and since DeVito had considered it a "nightmare," Cattell promised to "make it up" to him by getting him a project on "Country Time Lemonade." *Id.* at 1694, 1700. Thereafter, Cattell asked DeVito to meet her to discuss the Country Time job. DeVito met with Cattell, who told him that another company, Biondo Design, had been given Country Time's work, but that she was willing to give him the job. *Id.* at 1701. According to DeVito, just as soon as he had returned to his studio with the job in hand, Cattell called, directing him to bring the job back, which he did. *Id.*

Later that year, Cattell invited DeVito to lunch "to talk" and to give him some work. *Id.* at 1703. Over lunch, Cattell told DeVito that she had "a lot of work" that she could give him. Before agreeing to give him any work, however, Cattell asked him whether he had ever paid anyone money in order to get work. *Id.* After responding "no," to this question, Cattell said, "great, you're just the person I'm looking for." *Id.*

The next day, Cattell called DeVito with a "Kool–Aid job," that had become available because her associate, Harry Brooks, was on vacation. DeVito began the job. Two days later, Cattell called him to say that Brooks had returned from vacation and wanted the job back. DeVito returned the job to Kraft. *Id.*

Cattell then invited DeVito to shoot a job for "California Raisins," another Kraft product. That job had belonged to Joel Bronz Design, but Cattell had taken Bronz off the job, after having had "disagreements" with him. *Id.* at 1704. After DeVito completed the job, he sent Cattell a bill for his work. Cattell promised to pay DeVito within 30 days, and asked him to "borrow a limousine." *Id.* at 1705–06. Cattell borrowed the limousine for 4 days and then called DeVito with another job. After DeVito had begun working on this job, Cattell asked him again for the limousine. She also asked to borrow $200. *Id.* at 1706.

Thereafter, Cattell gave DeVito jobs on "Flintstones Fruity and Cocoa Pebbles," other Kraft products. *Id.* at 1707. Around this time, Cattell became the Senior Design Manager in charge of Kraft's children's cereal division. According to DeVito, whenever he sent Cattell a bill for his work on a cereal box, Cattell "wanted a percentage of . . . . [his] profit." *Id.* at 1718. In the beginning, she asked for 10% and suggested that he would be off the job and receive no further work, if he did not comply. *Id.* at 1718–19 ("[Y]ou know, you don't see Joel Bronz and William Petti (other designers) here anymore. I got rid of them.").

Cattell also required DeVito to prepare his bills within three days of having completed his work. When DeVito told her that he was unable to prepare the bills so quickly, Cattell told him that her husband would do it, because he "needed money." *Id.* at 1726. Cattell then told DeVito to buy a Brother typewriter, so that her husband could prepare the bills. *Id.* The Cattells kept the typewriter and never offered to pay for it. *See id.* Additionally, Cattell would not allow DeVito to charge for his "time"—the number of hours he spent on a job—or his overhead, when other vendors typically charged Kraft for these costs. *Id.* at 1729–30.

Cattell then began asking DeVito for 50% of his profits. DeVito claims that Cattell did not demand the 50% until he "went over to pickup the [first Flintstones] project, [and Cattell] presented him with the bill." *Id.* at

1731. When asked why she was taking 50%, Cattell said, "because that's what I want, take it or leave it," and, "if you don't want to do this," "[you] know where the door [i]s." *Id.*

DeVito also claims that Cattell showed up uninvited at a Christmas party for Prographics employees at his house. According to DeVito, when he and his wife "were walking around the house and everybody was having a good time[,] Claudia ... [said to DeVito and his wife that she] could replace these people any time [she] wanted and they [we]re all going to be out on the street," if he did not pay her 50% of his profits. *Id.* at 1907–08.

Additionally, DeVito claims that Cattell would get "upset" if he visited other clients. Cattell told him that he "couldn't keep running out [to those clients] because she needed [him] there[, in his office,] all the time...." *Id.* at 1727–28. Because of Cattell's demands, his relationships with the other clients soured, *see id.*, and he lost a lot of accounts. *Id.* at 1908. His wife became pregnant and he had "a lot of overhead with [his] house." *Id.* DeVito claims that if he did not give in to Cattell's demands, he would go bankrupt. DeVito says that he did "what he had to do," *id.*, because "virtually all of [his] income came from Kraft." DeVito Cross at 1955.

Kraft now moves for a partial summary judgment ruling that DeVito bribed Cattell and is liable to Kraft for the amount of the bribes, $3.2 million. Kraft argues that, as a matter of law, the bribes represent overcharges which Kraft paid and which he must reimburse. *See* Pl.'s Mem. of Law at 10 (citing *Donemar v. Molloy*, 252 N.Y. 360, 365, 169 N.E. 610 (1930)). Kraft's motion must be denied because there are genuine issues of material fact as to whether DeVito bribed Cattell or whether he was extorted by her, and whether he was unjustly enriched by his dealings with Kraft.

## Discussion

### I. *Summary Judgment Standard*

A court may grant summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988). If there is evidence in the record concerning any material fact from which an inference could be drawn in favor of the nonmovant, summary judgment will be denied. *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997). This is because on a motion for summary judgment, the Court's duty is "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir.1994).

In opposing a motion for summary judgment, the non-moving party must come forward with specific, material facts showing the existence of a genuine issue for trial. Fed. R.Civ.P. 56(e); *West–Fair Elec. Contractors v. Aetna Casualty & Surety Co.*, 78 F.3d 61, 63 (2d Cir.1996) A genuine issue of material fact exists if "a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Mere conclusory allegations, speculation or conjecture will not avail a party that resists summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

### II. *Evidence of Material Facts*

#### A. *DeVito's Testimony*

DeVito offers his testimony from his criminal trial in opposition to Kraft's motion for partial summary judgment, and to establish an affirmative defense, that he gave money to Cattell only because he was being extorted by her. Kraft objects to the introduction of DeVito's testimony on the ground that it is inadmissible hearsay under Fed.R. of Evid. 802, because DeVito "is not unavailable as a witness at this time," and Kraft "did not have an opportunity to develop [DeVito's] testimo-

ny by cross examination [at] the criminal trial." Pl.'s Reply Mem. of Law at 4.[1]

█ The Court must reject Kraft's argument. Sworn testimony from another trial is admissible on a motion for summary judgment. *Langston v. Johnson*, 478 F.2d 915, 918 n. 17 (D.C.Cir.1973) ("it is well settled that a certified transcript of judicial or administrative proceedings may be considered on a motion for summary judgment"); *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 899 F.Supp. 974, 985 (E.D.N.Y.1994) (same); *see also* 6 MOORE'S FEDERAL PRACTICE ¶ 56.11 [1.–8] at 56–204 ("court may consider ... certified transcripts of a court or administrative record or proceeding" under Fed.R.Civ.P. 56(e)). Transcript testimony serves the same purpose as an affidavit under Fed.R.Civ.P. 56, *Ricupero v. Wuliger, Fadel, & Beyer*, No. 91 Civ. 0589, 1994 WL 483871, at *4 (N.D.Ohio Aug.26, 1994), and is comparable in that each form of testimony is sworn and submitted without cross-examination by the adverse party. Accordingly, transcript testimony may be received into evidence if it is relevant and based on personal knowledge. *Gray v. Brown*, 93 Civ. 2732, 1994 WL 621977, at *5 n. 3 (N.D.Ca. Nov.1, 1994); *Private Sanitation*, 899 F.Supp. at 985.

█ Kraft does not dispute the authenticity of the transcript, question its relevancy, or advance any other reason why it should not be considered. Indeed, Kraft relies on portions of the same transcript in support of its motion. The excerpts of the transcript chosen by defendants may therefore be considered in opposition to Kraft's motion for partial summary judgment, even though they were authenticated by defendants' attorney and not by defendant DeVito himself. *See Airlie Foundation, Inc. v. United States*, 826 F.Supp. 537, 546 (D.D.C.1993) ("[c]ertified transcripts of prior testimony may be used [on] a motion for summary judgment .... [even if] not attached to [a party] [a]ffidavit"), *aff'd on other grounds*, 55 F.3d 684, 1995 WL 310025 (D.C.Cir.1995) (per curiam);

*Clifton v. Schafer*, No. 90 Civ. 0462, 1991 WL 353439, at *2 (W.D.Wis. Feb. 28, 1991) (considering excerpts from certified transcript of administrative hearing attached to attorney affidavit on motion for summary judgment).

## B. *Extortion*

█ Having determined that we may consider the certified transcript, we turn to whether there are material issues of fact as to the purpose and effect of DeVito's payments to Cattell. We conclude that there are.

Commercial bribing occurs when a person "confers ... any benefit upon any employee ... without the consent of the latter's employer ..., with [the] intent to influence his conduct in relation to his employer's ... affairs." N.Y.PENAL LAW §§ 180.00, 180.03 (McKinney's 1988). Extortion, on the other hand, is the obtaining of property by "comp[ulsion] or induc[ing] another person to deliver such property ... by a means of instilling in him a fear that if the property is not so delivered, the actor or another will ... harm [the] person materially with respect to his ... business calling, career, [or] financial condition...." *Id.*, § 155.05(2)(e).

█ These offenses are mutually exclusive. *People v. Dioguardi*, 8 N.Y.2d 260, 275, 203 N.Y.S.2d 870, 882, 168 N.E.2d 683 (1960); *People v. Kacer*, 113 Misc.2d 338, 340–42, 448 N.Y.S.2d 1002, 1004 (Sup.Ct.1982). *Cf.* N.Y.PENAL LAW §§ 155.10, 180.30, 200.15 (extortion by labor official or public servant is not a defense to bribe receiving charge). "Bribery is unqualified 'voluntary giving' " and extortion is giving while under "compulsion" to give. *Dioguardi*, 8 N.Y.2d at 275, 203 N.Y.S.2d at 883, 168 N.E.2d 683; *see also United States v. Covino*, 837 F.2d 65, 68 (2d Cir.1988) ("essential element" of commercial bribery is "pay me and be assisted," and of extortion, "pay me or be precluded") (citation omitted); *United States v. Brecht*, 540 F.2d 45, 51 (2d Cir.1976) ("difference between ... commercial bribe[ry] ... and ...

---

1. Fed.R.Evid. 804(b)(1) provides an exception to the hearsay rule, allowing, in pertinent part, for the admission of testimony given "at another hearing of the same or a different proceeding ... if the party against whom the testimony is now

offered ... had an opportunity and similar motive to develop the testimony by ... cross ... examination" and the "declarant is [now] unavailable as a witness."

extortion is that only the latter involves initiative on the part of the defendant and coercion on the part of the victim"); *Kacer*, 113 Misc.2d at 342, 448 N.Y.S.2d at 1004 (there is a "logical inconsistency between a crime involving compulsion by one guilty party and one involving a guilty agreement by two guilty parties"). In a case of bribery, the "payor [is] equally as guilty as the payee," "which [is] never ... the case with extortion." *Dioguardi*, 8 N.Y.2d at 273, 203 N.Y.S.2d at 881, 168 N.E.2d 683. Accordingly, DeVito is not liable to Kraft for the money he paid Cattell if the payment resulted from extortion rather than bribery. *See Hornstein v. Paramount Pictures*, 292 N.Y. 468, 471–72, 55 N.E.2d 740 (1944); *City of New York v. Corwen*, 164 A.D.2d 212, 218, 565 N.Y.S.2d 457, 460 (1st Dep't 1990).

■ Here, the parties contest whether DeVito bribed Cattell in order to secure future work from Kraft or was extorted by her under the threat of depriving him of current and future work opportunities. "Fear of future economic harm [that is reasonable] is sufficient to establish extortion under the statute." *See People v. Capparelli*, 158 Misc.2d 996, 603 N.Y.S.2d 99 (Sup.Ct.1993) (citing *People v. Spatarella*, 34 N.Y.2d 157, 161–62, 356 N.Y.S.2d 566, 568–69, 313 N.E.2d 38 (1974); *Dioguardi*, 8 N.Y.2d. at 268, 203 N.Y.S.2d at 877, 168 N.E.2d 683); *Kacer*, 113 Misc.2d at 347, 448 N.Y.S.2d at 1008 ("kickbacks ... demanded in exchange for the award of future contracts is ... sufficient"). This is because "extortion does not require evidence of an actual ability to cause the threatened harm ..., only that the person threatened believed that the defendant possessed such an ability." *Id.* (citing *United States v. Rastelli*, 551 F.2d 902, 905 (2d Cir.1977)).[2] Moreover, "[t]he fact that the threats [may have been] implied is no bar to finding that they actually existed." *Kacer*, 113 Misc.2d at 346, 448 N.Y.S.2d at 1007. *Cf. Covino*, 837 F.2d at 68 ("fear need not be

consequence of direct ... threat ... but need ... be reasonable under [the] circumstances") (citation omitted); *accord United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (in banc) ("the proof need establish that the victim reasonably believed ... that the defendant had the power to harm the victim, ... that the defendant would exploit that power to the victim's detriment .... [and] that nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit").

Here, DeVito's testimony provides sufficient evidence of a reasonable fear that he would lose all opportunities to work for Kraft if he did not comply, with Cattell's requests. According to DeVito, if he did not pay Cattell 50% of his profits, he and his employees would be "out on the street," and his businesses would go "bankrupt." A jury could find DeVito's fear reasonable, if it believed this testimony, because it is undisputed that Cattell controlled the graphic designer's access to Kraft. Moreover, according to DeVito, Cattell had caused him to lose his other clients so that by the time she had demanded a 50% cut, his ability to refuse her demands had been seriously weakened.

This case is much like *Covino*, 837 F.2d at 66, 68, in which the Court of Appeals for the Second Circuit reversed a judgment of acquittal under the Hobbs Act, ruling that the evidence had been sufficient to sustain a conviction for extortion. In that case, Covino, a NYNEX employee, had been accused of extorting money and property from Great Northeastern Building and Management Corporation, "a small, newly formed contracting firm .... [that] had originally been hired by NYNEX to provide consulting services but later became the prime contractor for the construction of certain cell sites." 837 F.2d at 66. The evidence suggested that Covino "had substantial, although not absolute, control over the selection, supervision and payment of contractors hired [by

**2.** New York courts considering evidence of extortion frequently refer to federal cases interpreting the Hobbs Act, 18 U.S.C. § 1951 *et seq.*, which is based on the former New York extortion statute. *Capparelli*, 158 Misc.2d at 1003 n. 1, 603 N.Y.S.2d at 104 n. 1; *Kacer*, 113 Misc.2d at 346 n. 2, 448 N.Y.S.2d at 1007 n. 2. The same allega-

tions used to plead predicate acts of extortion under the Hobbs Act are sufficient to establish extortion under N.Y.Penal Law § 155.05(2)(e). *National Elec. Benefit Fund v. Heary Bros. Lightning Protection Co., Inc.*, 931 F.Supp. 169, 188–89 (W.D.N.Y.1995).

NYNEX] to build cell sites." *Id.* While Covino "could not act for NYNEX without the formal approval of other NYNEX executives, . . . he could . . . approve or disapprove invoices and materially aid [a contractor] in obtaining cell site construction contracts." *Id.* When a Great Northeastern employee had improperly billed $3,200 in telephone calls to NYNEX, Covino promised to "take care of [it]." *Id.* at 67. Thereafter, Covino approached Brennan, the owner of Great Northeastern, to build a sun deck at his house. "After being told by Covino to 'keep in mind the phone bill,' Brennan agreed to build the . . . deck at a cut-rate price." *Id.* Additionally, he paid Covino $85,000. *Id.* At Covino's trial, Brennan testified that Great Northeastern had "become almost totally dependent upon its construction contracts with NYNEX," "in accordance with letters of authorization to be issued by Covino," and that "he feared that if he refused to accede to Covino's demands, Covino would use his power to drive Great Northeastern out of business by withholding payments on completed work and by denying Great Northeastern any new construction work for NYNEX." *Id.* The Court concluded that there existed sufficient evidence of extortion to warrant Covino's conviction, in part because it considered. Brennan's fear that Covino would deny him future work at NYNEX "reasonable under the circumstances." *Id.* at 68 & n. 1.

Under the *Covino* standard, DeVito has raised a material issue of fact as to whether he was extorted by Cattell. In particular, we conclude that a reasonable jury could find that Cattell's comments, that DeVito "would be out on the street," if he did not kickback 50% of his profits to Cattell, and that "he knew where the door was," if he did not like the arrangement, constituted extortion. *See Brecht,* 540 F.2d at 52 (single incident by purchasing agent in obtaining $1,000 from prospective subcontractor was extortion where evidence suggested that subcontractor would be denied chance to obtain contract without payment); *Viacom Int'l Inc. v. Icahn,* 747 F.Supp. 205, 211 (S.D.N.Y.1990) (issue of material fact raised where testimony suggested that plaintiff's officers had reasonable fear of "'preclusion or diminished opportunity for . . . existing or potential economic benefits'" if they did not buy defendants' shares) (quoting *Covino,* 837 F.2d at 68 n. 1). This is particularly true in light of Cattell's escalating demands on DeVito's business and DeVito's increasing reliance on Kraft to get work. *See, e.g., Covino,* 837 F.2d at 68 (defendant's statement, that he wanted "share" of future profits, "followed by inquiry whether [contractor] wanted to do his 'share' in the context of [defendant's] increasing demands for services and.cash," could be considered threat of future harm under Hobbs Act); *United States v.. Shine,* 526 F.Supp. 717, 719 (E.D.N.Y.1981) (where "testimony indicated that . . . work was not readily available . . . [and] that the defendant wielded extensive supervisory powers on the job site . . . . jury could have inferred . . . that if [the contractors] lost the[ir] contract with defendant, they would not have been able to procure equally lucrative contracts elsewhere . . . [and] that . . . without paying, the[y] . . . would not be considered for future . . . contracts [with defendant]"). *See also United States v. Margiotta,* 688 F.2d 108, 133 (2d Cir.1982) (rejecting defendant's challenge to sufficiency of evidence where evidence suggested that insurance company would lose position as broker of record for county if it failed to pay certain kickbacks); *United States v. Clemente,* 640 F.2d 1069, 1073 (2d Cir.1981) (conviction upheld where nonpayment would have caused carpenter to lose account); *Rastelli,* 551 F.2d at 904–05 (same, where failure of lunch truck suppliers to pay kickbacks to union official would lead to loss of union-members' business).

DeVito testified that he feared losing Kraft's business, and of being denied future business with Kraft, if he did not comply with Cattell's demands and there is ample circumstantial evidence corroborating that testimony. It is up to a jury to determine whether DeVito's fear was reasonable. *See Covino,* 837 F.2d at 68; *Viacom,* 747 F.Supp. at 211. Such determination will depend in large part on the credibility of the witnesses, which the Court may not consider on a motion for summary judgment. The Court therefore must deny the motion for summary judgment insofar as it seeks to compel DeVito to reim-

burse Kraft for the $3.2 million he paid to Cattell.

■ There are also disputed issues of material fact as to whether DeVito was unjustly enriched. He testified that his charges to Kraft, even including the amounts extorted from him by Cattell, were fair, reasonable and comparable to those charged by competing vendors for similar work. *DeVito Cross* at 1971. This was confirmed by Cattell's boss, William Fasano, who approved all of Devito's invoices, and who testified that Devito's prices conformed to Kraft's standard pricing for packaging artwork. *Fasano Cross* at 218–19, 240–60. Based on such evidence, a reasonable jury could find that, instead of being "enriched" by his payments to Cattell, Devito was impoverished thereby, because those payments came out of what otherwise would have been his reasonable profit on the work.

■ The same factual issues preclude summary judgment on Kraft's claim for common law fraud. Because a reasonable jury could find that Kraft was not overcharged, it could find that Kraft suffered no injury as a result of Devito's failure to disclose that he was making extorted payments to Cattell. Injury is, of course, a necessary element of a claim for common law fraud. *Held v. Kaufman*, 91 N.Y.2d 425, 431, 671 N.Y.S.2d 429, 432, 694 N.E.2d 430 (1998). It is also a necessary element of a claim for violation of fiduciary duty. *Chalom v. Liparelli*, 236 A.D.2d 354, 355–56, 653 N.Y.S.2d 641, 643 (2d Dep't 1997).

### Conclusion

For the foregoing reasons, plaintiff's motion seeking a partial summary judgment against defendants DeVito and Prographics II on the claims for unjust enrichment, breach of fiduciary duty and common law fraud is denied.

SO ORDERED.