06-3112-cr (L)
United States v. Rudaj (Ivezaj)

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

———————

August Term, 2007

(Argued: May 13, 2008            Decided: June 11, 2009)

Docket Nos. 06-3112-cr (L), 06-3275-cr (CON), 06-3296-cr (CON), 06-3339-cr (CON), 06-3372-cr (CON), 06-5908-cr (CON)

————————————————

UNITED STATES OF AMERICA,

*Appellee*,

– v. –

PRENKA IVEZAJ, NARDINO COLOTTI, ALEX RUDAJ, ANGELO DIPIETRO, NIKOLA DEDAJ, AND LJUSA NUCULOVIC,*

*Defendants-Appellants*.

————————————————

Before: FEINBERG, MINER, and B.D. PARKER, *Circuit Judges*.

Defendants appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Cote, *J.*) for racketeering, RICO conspiracy, conspiracy to conduct an illegal gambling business, and using and carrying firearms during and in relation to a crime of violence. Affirmed.

\* The Clerk of Court is directed to amend the official caption as indicated.

RICHARD A. GREENBERG (Steven Y. Yurowitz, *on the brief*), New York, N.Y., *for Defendant-Appellant Prenka Ivezaj.*

RICHARD WARE LEVITT (Yvonne Shivers, *on the brief*), New York, N.Y., *for Defendant-Appellant Nardino Colotti.*

HAROLD PRICE FAHRINGER (Erica T. Dubno, *on the brief*), New York, N.Y., *for Defendant-Appellant Alex Rudaj.*

JONATHAN SVETKEY, New York, N.Y., *for Defendant-Appellant Angelo DiPietro.*

DIARMUID WHITE (Brendan White, *on the brief*), New York, N.Y., *for Defendant-Appellant Nikola Dedaj.*

JOHN BURKE, Brooklyn, N.Y., *for Defendant-Appellant Ljusa Nuculovic.*

JENNIFER G. RODGERS, Assistant U.S. Attorney (Timothy J. Treanor, Benjamin Gruenstein & Jonathan S. Kolodner, Asst. U.S. Attorneys, *on the brief*), *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, N.Y., *for Appellee.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Defendants-Appellants Prenka Ivezaj, Nardino Colotti, Alex Rudaj, Angelo DiPietro, Nikola Dedaj, and Ljusa Nuculovic (collectively "appellants" or "defendants") appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Cote, *J.*) on charges arising from their involvement in a racketeering enterprise. We affirm the convictions for the reasons stated in this opinion and in a companion summary order.

**BACKGROUND**

The indictment charged, and the trial evidence, considered in the light most favorable to the government, established that the appellants were members of the Rudaj Organization (the "Organization"), a violent Albanian racketeering organization based in New York City and Westchester County. The government alleged that the Organization sought to challenge, through violence and intimidation, the primacy of the New York City area's traditional organized crime families. Gambling was a particularly active area of competition. After operating illegal gambling businesses in the Bronx and Westchester County, the Rudaj Organization forcibly took over several illegal gambling clubs in Astoria, Queens and required other bars and restaurants to install and use its gambling machines. In addition to gambling, the Organization engaged in a variety of other illegal conduct, including extortion, loansharking, and bank fraud.

These activities generated an indictment initially containing twenty-one counts, fifteen of which were ultimately presented to the jury. We address here only those relevant to our opinion. Count One charged all of the appellants with substantive racketeering, and Count Two charged them with racketeering conspiracy. *See* 18 U.S.C. § 1962(c), (d). To establish the pattern of racketeering activity charged in Count One, the government alleged that the defendants engaged in a series of predicate acts, many of which were also charged as separate counts. Of these, Racketeering Acts Four and Five are at the center of our analysis. Racketeering Act Four alleged that Rudaj, Dedaj, Ivezaj, Nuculovic, and DiPietro attempted to extort, conspired to extort, and extorted control of an illegal gambling operation from Fotios Dimopoulos and Antonios Balampanis. Racketeering Act Five charged Rudaj, Colotti, Dedaj, Ivezaj, Nucolovic, and DiPietro with extorting and conspiring to extort the owners of a gambling business, known as

3

"Soccer Fever," in violation of New York's extortion laws. *See* N.Y. Penal Law §§ 105.13, 155.05, 155.40. All defendants were also charged in Count Thirteen with using and carrying firearms in aid of racketeering. *See* 18 U.S.C. §§ 924(c)(1)(A)(ii) & 2.

The government's evidence included the testimony of investigating officers, various cooperating witnesses and victims, consensual tape recordings, recorded conversations from Title III interceptions, as well as physical evidence seized during various searches. At the conclusion of the trial, the district court dismissed several of the counts. The defendants were then convicted on all but one of the remaining counts (but not all of the predicate racketeering acts) and were sentenced to substantial prison terms.

The defendants appeal on various grounds. We decide here that control over illegal intangible property – here a gambling operation – is "property" that can be "delivered" under New York's extortion statute. We also conclude that Balampanis was a proper "victim" of an inchoate extortion offense under New York law; that Count One qualified as a "crime of violence" under 18 U.S.C. § 924(c); and that the district court did not err in applying a role enhancement to Ivezaj's sentence. Additionally, we decide that the admission of evidence seized from Rudaj's home, if error at all, was harmless. Accordingly, we affirm the judgments.

**DISCUSSION**

I.   Whether Illegal Intangible Goods Qualify as "Property" under New York
     Extortion Law

Defendants[1] challenge their convictions on Racketeering Acts Four and Five, which

---

[1]   Several of the defendants simply join in the arguments of their co-defendants where there is no inconsistency between those arguments and the arguments made in their own briefs. We use the general term "defendants" to avoid confusion.

4

alleged violations of New York's extortion laws.[2] Their main contention is that the alleged acts are legally insufficient to sustain a conviction because control over illegal gambling does not constitute "property" under New York's extortion law and, even if it did, no property was "delivered" as is required by the statute. We review *de novo* the grant or denial of a Rule 29 motion for judgment of acquittal. *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008); *United States v. Florez*, 447 F.3d 145, 154 (2d Cir. 2006).

As proof of Racketeering Act Four, the government established that the Organization, through violence and intimidation, wrested control of certain illegal gambling operations in Astoria from the Lucchese Crime Family. In June of 2001, members of the Rudaj Organization seriously assaulted Antonios Balampanis, a close companion of Fotios Dimopoulos, a Lucchese family associate who supervised their Astoria operations. Dimopoulos later told Balampanis that his beating had been intended as "a message" for Dimopoulos, and Dimopoulos never returned to gambling clubs in Astoria following the assault.

Racketeering Act Five related to the Rudaj Organization's operation of "barbut," a lucrative gambling activity in Astoria. In early August 2001, a Gambino associate, Tommy Napoli, opened a gambling club known as "Soccer Fever" that directly competed with barbut and was operated by Mikhail Hirakis. On the club's first night, Soccer Fever brought in approximately $8,000. The next night, approximately fifteen members of the Organization, including the six defendants, stormed the club with guns on the instruction of Rudaj and broke up

---

[2] State law crimes such as extortion can constitute racketeering acts under RICO. 18 U.S.C. § 1961(1)(A) includes "any act or threat involving . . . extortion, . . . which is chargeable under State law and punishable by imprisonment for more than one year" in its definition of "racketeering activity."

5

the game. They intended to assault Napoli, but when they were unable to locate him, they assaulted Hirakis instead. Rudaj intimidated the club's patrons: "I don't want to see nobody here. If I see [you] one more time, I swear to God . . . I beat you . . . one by one. I eat you up. . . . It's closed." That was the end of Soccer Fever, and the Organization subsequently extended its control of illegal gambling in Astoria.

Under New York law, "[a] person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will . . . [c]ause physical injury to some person in the future . . . ." N.Y Penal Law § 155.05(2)(e)(1). "Property" is defined as "any . . . personal property. . . or any article, substance or thing of value . . . which is provided for a charge or compensation." N.Y. Penal Law § 155.00(1).

The district court instructed the jury that "[t]he term property includes not only money and other physical or tangible things, but also any valuable right considered as a source or element of wealth." Moreover, "[t]he pursuit of a business, including the solicitation of customers necessary to the conduct of the business, is considered property, as are the proceeds of a business." Further, the court charged that "[i]t does not matter . . . if the victim's initial acquisition or possession of tangible property was illegal, or if the business in which the victim is engaged is illegal. Illegally obtained assets and businesses conducted in violation of the law can constitute property."

While acknowledging that an intangible good may constitute property under New York law, defendants challenge this instruction on the ground that "control over illegal gambling" does

not constitute property because a legal right to the alleged property is required before it can qualify as property under New York law. They contend that because the Luccheses and the various victims had no legal right to operate an illegal gambling business, Racketeering Acts Four and Five did not sufficiently allege extortion.

We agree with the district court that an illegal gambling business can constitute property under New York law. The statute broadly defines "property" as "any . . . personal property, real property . . . substance or thing of value . . . which is provided for a charge or compensation." N.Y. Penal Law § 155.00(1). Illegal intangible property, such as that contemplated here, fits within this expansive definition: control over illegal gambling is a "thing of value" which is "provided for . . . compensation."

This understanding is consistent with the New York courts' recognition that intangible property as well as illegal tangible property are covered by the statute. For example, in *People v. Garland*, 69 N.Y.2d 144, 147 (1987), the New York Court of Appeals held that intangible goods – in that case, a tenant's right to occupy an apartment – could constitute "property," noting that "an interest need not be transferable to constitute 'property' [under N.Y. Penal Law § 155.00(1)]." *See also People v. Spatarella*, 34 N.Y.2d 157, 162 (1974) ("property" includes intangible goods, because "[s]urely the extortionist's demand for the business itself, or a part of it, is, if anything, more egregious than the demand simply for money"); *People v. Dixson*, 798 N.Y.S.2d 659, 664 (Crim. Ct. 2005). Under New York law, illegal tangible goods can also constitute "property." *See People v. Hardwick*, 524 N.Y.S.2d 798, 800 (App. Div. 1988) ("That it was unlawful for [the victims] to possess the narcotics is no defense to the defendant's unlawful taking of them.");

7

*People v. Izzo*, 409 N.Y.S.2d 623, 624 (Crim. Ct 1978) ("Ownership . . . is a broad concept. Even a person who has himself stolen property has a right of possession superior to that of a third person who wrongfully takes it from him . . . ."); *see generally People ex rel. Short v. Warden of City Prison*, 130 N.Y.S. 698, 700 (App. Div. 1911) ("'[P]roperty'" is "intended to embrace every species of valuable right and interest, and whatever tends in any degree, no matter how small, to deprive one of that right, or interest, deprives him of his property."). Given such an expansive definition of "property," and the absence of any legality requirement in the statute, we see no indication that the New York legislature intended that illegal intangible assets could not be the subject of extortion.

Our jurisprudence interpreting the Hobbs Act also supports our analysis here. The Hobbs Act was modeled on the New York extortion statute, and New York courts have often looked to Hobbs Act jurisprudence for guidance. *See, e.g., People v. Capparelli*, 603 N.Y.S.2d 99, 104 n.1 (Sup. Ct. 1993) (citing cases for the proposition that "New York appellate courts frequently refer to federal cases interpreting the Hobbs Act"); *see also Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 403 (2003) ("Congress used two sources of law as models in formulating the Hobbs Act: the Penal Code of New York and the Field Code, a 19th-century model penal code."). In *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), we reviewed our Hobbs Act precedents following the Supreme Court's decision in *Scheidler,* and we reaffirmed that "intangible property rights can qualify as extortable property under the Hobbs Act . . . ." 459 F.4d at 323. Moreover, we held that such rights "can qualify as extortable property under the Hobbs Act regardless of whether its exercise, transfer, or sale would be legal." *Id.* at 325. Importantly, we did not "see

8

any basis for imposing a 'legality' requirement on the extortion of both tangible and intangible property." *Id.* at 326.

Defendants argue that even if control over an illegal gambling business could be extorted under New York law, defendants did not "obtain" this property because it was never "delivered" to them. *See* N.Y. Penal Law § 155.05(2)(e). We find this interpretation imaginative but overly literal and, in any event, not supported by the law. Under New York law, an intangible property right – which by definition cannot be "delivered" in the traditional sense – can be extorted. *See Garland*, 69 N.Y.2d at 146-47; *Spatarella*, 34 N.Y.2d at 162 ("property" under the extortion statute includes intangible rights). For similar reasons, we reject defendants' argument that they could not have transferred or delivered control over a criminal business "in any sense that the law protects." Again, it is established under New York law that illegal goods, such as drugs or drug proceeds, which are not capable of lawful transfer, fall under the extortion statute. *See Hardwick*, 524 N.Y.S.2d at 800.

II.   Whether Balampanis is a Victim of Inchoate Extortion Offenses Under New York Law

The defendants also argue that "[w]hatever the reason for Balampanis's beating, he could not be the actual or intended 'victim' of an inchoate extortion offense." New York law requires that the victim of a substantive extortion offense be an "owner" of the extorted property. Defendants focus on the use of the word "owner" in the statute, which provides that "[w]hen property is taken, obtained or withheld by one person from another person, an 'owner' thereof means any person who has a right to possession thereof superior to that of the taker, obtainer or withholder." N.Y. Penal Law § 155.00(5). They contend that the government's proof and the

9

court's charge were insufficient because the "victim" of extortionate conduct must own or control the property extorted, and Balampanis did neither.

The district court rejected the defendants' arguments. On this count, in response to a jury request on this issue,[3] the court instructed the jury as follows:

> THE COURT: Racketeering Act Four charges three crimes. To find that the crime of extortion was committed, you must find that at least Foti Dimopoulos was a victim of the extortion.
>
> With respect to the crimes of attempted extortion and conspiracy to commit extortion, you must find that at least one of the two identified victims in Racketeering Act Four, Foti Dimopoulos and Tony Balampanis, was an intended victim of those crimes.
>
> You may also consider or lump together the evidence regarding both identified victims to decide whether the government has proven any one of these three charges; extortion, attempted extortion or conspiracy to commit extortion. Remember in this context that it is a crime to use force or violence against one person to obtain property from another with that second person's consent by instilling fear in that second person, as I have explained in my charge.

Given the tripartite nature of Racketeering Act Four – which alleged that several of the defendants engaged in extortion conspiracy, substantive extortion, and attempted extortion and that "any one of which . . . constitutes the commission of Racketeering Act Four" – we find no error in the court's instructions. The district judge properly charged that Balampanis could be a victim for the attempt and conspiracy offenses. The fact that Balampanis was not actually the owner does not matter for these offenses; rather, the key inquiry for the jury in an attempted extortion charge is whether the defendants *thought* he was. *See People v. Davis*, 72 N.Y.2d 32, 36

---

[3] The jury sent a note during deliberations asking whether "the victims, Foti Dimopoulos and Tony Balampanis, [should be] looked at individually or lumped together as victims[.]"

(1988) ("[F]actual impossibility will not provide a defense to a prosecution for attempted intentional acts . . . ."); *People v. Gardner*, 144 N.Y. 119, 124-26 (1894) (factual impossibility is no defense to attempt because attempt "depends upon the mind and intent of the wrongdoer, not on the effect or result upon the person sought to be coerced"); N.Y. Penal Law § 110.10 ("If the conduct in which a person engages otherwise constitutes an attempt to commit a crime . . . , it is no defense . . . that the crime charged to have been attempted was . . . factually or legally impossible of commission . . . ."). The same is true for conspiracy; only the defendants' state of mind is relevant. *See People v. Russell*, 555 N.Y.S.2d 67, 68 (App. Div. 1990) (impossibility is not a defense to conspiracy).

Because there was ample evidence that the defendants believed Balampanis, a close associate of Dimopoulos, helped control illegal gambling in Queens – no matter whether he did or not – we conclude that the district court did not err in denying the defendants' Rule 29 motion and charging the jury that Balampanis could be a victim of the attempt and conspiracy charges.

III.    Defendants' 18 U.S.C. § 924(c) Convictions

Next, defendants challenge their firearms convictions. Under 18 U.S.C. § 924(c)(1)(A), "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" is guilty of a federal crime. Count Thirteen charged the defendants with violating this provision, specifically naming Count One, the substantive racketeering charge, as the predicate crime of violence.

11

Defendants raise two challenges to their § 924(c) conviction. First, they challenge the district court's ruling that Count One qualifies as a "crime of violence." The district court held that the convictions fell within § 924(c), because Count One specifically charged violent predicate racketeering acts, even though a conviction under § 1962 is not necessarily a conviction for a crime of violence.

A crime of violence is an offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" or "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(A), (c)(3)(B). When determining whether an offense is a "crime of violence" under the statute, we employ a "categorical approach," in which "we focus on the intrinsic nature of the offense rather than on the circumstances of a particular crime." *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006). In *Acosta*, we concluded that a conspiracy to "injure, oppress, threaten, or intimidate any person" in connection with exercising their constitutional rights under 18 U.S.C. § 241 was a crime of violence. We reasoned that "[s]ince applying physical force is perhaps the most obvious way to injure, threaten, or intimidate, a conspiracy to engage in such conduct is, by its nature, a conspiracy that involves a 'substantial risk that physical force' will be used." *Id.* at 136.

Applying this categorical approach, we first look to "the intrinsic nature" of the statute. Section 1962(c), the statutory basis for the substantive racketeering offense in Count One, provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." A pattern of racketeering activity is defined as "at least two acts of racketeering activity . . . ." 18 U.S.C. § 1961(5). *See United States v. Gotti*, 451 F.3d 133, 136-37 (2d Cir. 2006) (elaborating on how a "pattern of racketeering" may be proven).

Because racketeering offenses hinge on the predicate offenses comprising the pattern of racketeering activity, we look to the predicate offenses to determine whether a crime of violence is charged. Applying this reasoning, we hold that where the government proves (1) the commission of at least two acts of racketeering and (2) at least two of those acts qualify as "crime[s] of violence" under § 924(c), a § 1962 conviction serves as a predicate for a conviction under § 924(c).[4] We thus find no error in the district court's conclusion that the charged RICO offense was a crime of violence. The underlying predicate acts, with one exception,[5] allegedly involved the use of violent means, including loansharking and violent acts of extortion; unquestionably, the conduct charged in Count One posed a "substantial risk that physical force against the person or property of another" would be used in its commission. *See* 18 U.S.C. § 924(c)(3)(A), (c)(3)(B).

---

[4]     This conclusion aligns neatly with our caselaw that a RICO conspiracy can constitute a "crime of violence" under statutes that provide virtually identical definitions of that term to the definition provided in § 924(c). *See, e.g.*, *United States v. Ciccone*, 312 F.3d 535, 541-42 (2d Cir. 2002) (holding that the charged RICO conspiracy was a crime of violence under the Bail Reform Act); *United States v. Doe*, 49 F.3d 859, 866-67 (2d Cir. 1995) (finding no error in district court's ruling that a RICO conspiracy was a crime of violence under the Juvenile Delinquency Act).

[5]     The only predicate act that was not a crime of violence was one charging gambling offenses.

13

The defendants' second contention is that, because the violent predicates were state law offenses, their crime of violence was not one "prosecut[able] in a court of the United States" as required by § 924(c). We conclude that whether the alleged firearms conduct was premised on state or federal predicates is irrelevant, provided that the government proves, as it did here, that the § 1962 offense alleging the pattern of racketeering is a crime of violence. The jury only considered the state law predicates to determine that the defendant used firearms as charged in Count One, which, as previously discussed, is undeniably a crime "prosecut[able] in a court of the United States" and a "crime of violence" for the purposes of § 924(c).

IV.    Whether Evidence from Rudaj's Home Should Have Been Suppressed

We next consider whether the district court erred in admitting evidence taken from a search of Rudaj's bedroom and walk-in closet. On an appeal from a district court's ruling on a motion to suppress evidence, we review the court's factual findings for clear error, viewing the evidence in the light most favorable to the government. The district court's legal conclusions are reviewed *de novo*. *See United States v. Rodriguez*, 356 F.3d 254, 257 (2d Cir. 2004).

At approximately 6:30 in the morning on October 26, 2004, federal law enforcement agents knocked on Rudaj's door to execute an arrest warrant. The agents did not have a search warrant for Rudaj's home. Rudaj answered the door unarmed and in his boxer shorts; the government accompanied him inside, purportedly to get him dressed. Rudaj told the agents that he had a loaded hunting rifle next to his bed, which they would see when they entered his bedroom. He also said that no other individuals other than his wife and children were in the home.

14

After handcuffing Rudaj, the agents then secured the rest of his family members on the first floor and executed what they termed a "protective sweep," which included, as one agent testified, "the bedroom in part because we have to be in the residence in order to get him dressed." Agent Gregory Massa testified that he and his partner went upstairs to the master bedroom, and after observing the rifles propped against the bed, cleared the bedroom to ensure the safety of themselves and the other agents and to confirm that no one else was there.

They first entered the walk-in closet in the master bedroom because it "posed the greater threat." They saw the barrel of a rifle above a pile of clothing and proceeded to clear that corner of the closet. Agent Massa testified that while doing so, they "noticed another weapon that was shorter, another rifle that was shorter in length, and several clear plastic bags which you could clearly see that contained gun cleaning equipment, things of that nature, all right in the same area." They also saw a green handgun case and two knives. The agents then cleared the second smaller closet and saw another bag, similar to those seized from the walk-in closet, and a box that contained handgun holsters, a taser, and handcuffs.

The district court denied in part and granted in part Rudaj's motion to suppress the evidence taken from his home. The court first concluded that the search of his closets could not be characterized as a protective sweep incident to his arrest. Applying *Maryland v. Buie*, 494 U.S. 325 (1990), the district court found that the sweep did not involve a search "adjoining the place of arrest" nor did the agents have articulable facts regarding the presence of others posing a danger to them to justify a more far-reaching search.

15

Nevertheless, the court ruled that the evidence from the search of the bedroom — the two guns on either side of the night stand and the money and keys found on the dresser — was admissible. Looking to our holding in *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977), in which we held that officers have a duty to find clothing when the defendant is arrested in a state of undress, the court concluded that the agents properly secured Rudaj and, in looking for his clothing in the bedroom, could seize the contraband in his bedroom that was in plain view.

The district court further ruled that the evidence from the walk-in closet was admissible as a security sweep incident to the search for Rudaj's clothing. The district court reasoned that "[t]here is every reason to find that the balance struck in *Buie* should extend to protective searches that are conducted incident to the entry into a residence for the purpose of securing clothes for an insufficiently dressed arrestee." Therefore, because the area in the walk-in closet could potentially harbor a dangerous individual, the agents appropriately opened the closet door and observed the barrel of a handgun lying on a shelf in plain view and were therefore entitled to search the back of the closet and seize the weapon. While there, the court reasoned, they could also seize other incriminating evidence in plain view. However, the district court concluded that the evidence from the second, smaller closet was inadmissible because the objects removed from that closet – a white plastic bag and a plain cardboard box – were not "patently incriminating" because, unlike the white plastic bags properly removed from the master closet, the "the bag in the smaller closet did not reveal any incriminating contents through the transparent plastic." Thus, the agents were not justified in removing that bag from the closet to assess its contents.

We agree that the agents were permitted to enter Rudaj's bedroom to find clothing for him and seize any incriminating evidence that was in plain view. However, Rudaj also argues that the district court wrongfully expanded the scope of the "protective sweep" doctrine by admitting the evidence seized from the closets. In *United States v. Miller*, 430 F.3d 93 (2d Cir. 2005), decided after the district court's denial of Rudaj's suppression motion, we specifically held that the "protective sweep" doctrine delineated in *Buie* applies in "circumstances other than during the in-home execution of an arrest warrant." *Miller*, 430 F.3d at 100. Similarly, we stated that protective sweeps would be justified only if the police possessed "specific, articulable facts giving rise to a reasonable inference of danger." *Id.* Rudaj argues that because the officers had no articulable reason to believe that the closets posed any danger, the district court should have suppressed all of the evidence from the closets.

We need not even resolve the question of whether *Miller* extends to the search of the closets at issue here, because we conclude that the admission of the evidence against Rudaj, if error at all, was harmless. A district court's erroneous admission of evidence is harmless "if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *United States v. Garcia*, 291 F.3d 127, 143 (2d Cir. 2002) (quoting *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992)). In conducting harmless error review, we consider the following factors: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted [evidence]; and (4) whether such evidence was cumulative of other properly admitted evidence." *United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007) (quoting *Zappulla v. New York*, 391

17

F.3d 462, 468 (2d Cir. 2004) (internal quotation marks omitted)); *see also United States v. Garcia*, 413 F.3d 201, 217 (2d Cir. 2005).

Although the government discussed the evidence at summation, we conclude that the admission of the evidence was harmless error. First, the government's evidence as to the issue of Rudaj's involvement in violent conduct was extensive. Several of Rudaj's recorded conversations in which he described engaging in violent extortionate conduct involving guns were heard by the jury. Additionally, multiple witnesses testified about the violent crimes that Rudaj committed in furtherance of the Organization. Thus, the evidence consisting of the rifles and ammunition seized at the scene was cumulative of the testimonial evidence regarding Rudaj's participation in violent racketeering acts. Further, it is unlikely that Rudaj was prejudiced by the government's statements. The district court instructed the jury that it could only convict Rudaj of the § 924(c) charge if it found that he had used or carried a firearm in connection with either the extortion of Dimopoulos and Balampanis or that of the Soccer Fever victims. In light of these instructions, the seized evidence from his house had little impact on Rudaj's § 924(c) conviction. Because the government adduced ample evidence to establish Rudaj's commission of the substantive RICO offense apart from the admission of the guns, we see no reason to disturb his conviction.

## V.    Ivezaj's Role Enhancement

Finally, Ivezaj challenges his sentence on the ground that any aggravating role enhancement the district court applied should have been based on the conduct alleged in the underlying predicate acts, rather than on his role in the RICO enterprise as a whole. We typically review a district court's factual findings in support of a role enhancement for clear error. *See United States v.*

18

*Huerta*, 371 F.3d 88, 91 (2d Cir. 2004). However, because Ivezaj's challenge requires us to make a legal determination about the applicability of the enhancement, we review the district court's determination *de novo*. *See United States v. Chacko*, 169 F.3d 140, 150 (2d Cir. 1999).

U.S.S.G. § 2E1.1 addresses the base offense levels for RICO offenses, requiring a base offense level of 19 or the offense level applicable to the underlying racketeering activity. Application Note 1 to the Guideline provides that:

> Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.

U.S.S.G. § 2E1.1, cmt. n.1. Because the Application Note treats each predicate act as "if [it were] contained in a separate count of conviction" for purposes of determining the offense level for the alleged racketeering activity, Ivezaj argues that the district court failed to consider his role in each charged act when applying the role enhancement.

We agree with the district court that a defendant's role adjustment is to be made on the basis of the defendant's role in the overall RICO enterprise. In *United States v. Damico*, the Seventh Circuit concluded that:

> [The Application Note] only requires the underlying offenses to be treated separately "for the purposes of subsection (a)(2)" – that is, only for the purpose of establishing the base offense level applicable to the RICO conspiracy. The note does not say that the separate treatment extends as well to application of the Chapter Three adjustments.

99 F.3d 1431, 1437 (7th Cir. 1996); *accord United States v. Yeager*, 210 F.3d 1315, 1316 (11th Cir. 2000).

19

We find *Damico* persuasive. First, as the government contends, analyzing a defendant's role in the overall RICO enterprise makes a good deal more sense than considering his role in each underlying predicate. In the case of a § 3B1.1(b) role enhancement, it makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted on the basis of his participation in discrete racketeering acts. For example, a defendant who served as a leader or manager of an extensive RICO enterprise should not be able to avoid a role enhancement simply because certain predicate acts involved fewer than five participants or criminal activity that was not extensive. Second, we agree that the language of the Guidelines is clear that the requirement to look at each individual act in a RICO offense is only for the purpose of establishing the base level offense, not for applying the Chapter Three adjustments.

Therefore, we agree with the Seventh Circuit that there is "nothing in section 2E1.1 or its commentary to indicate that an adjustment like that in section 3B1.1 should not be applied to a RICO base offense level . . . in the same way that it would to any other base offense level," that is, "by looking to the count of conviction . . . and all relevant conduct . . . ." *Damico*, 99 F.3d at 1437. Because there was sufficient evidence to show that Ivezaj qualified for the enhancement for his role in the overall RICO enterprise, we affirm his sentence.

**CONCLUSION**

For the foregoing reasons, the judgments of conviction are AFFIRMED.

20