# United States Court of Appeals
## For the First Circuit

No. 20-1749

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE MUÑOZ-MARTINEZ,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]


Before

Barron, Chief Judge,
Howard and Thompson, Circuit Judges.

Ramón M. González-Santiago for appellant.
Tyler Anne Lee, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, W. Stephen Muldrow, U.S. Attorney, District of Puerto Rico, Mariana E. Bauzá-Almonte, Assistant U.S. Attorney, Appellate Chief, and Robert P. Coleman II, Assistant U.S. Attorney, were on brief, for appellee.

August 22, 2023

**HOWARD**, **Circuit Judge**.  Jorge Muñoz-Martínez ("Muñoz"), a former narcotics officer with the Puerto Rico Police Department ("PRPD"), appeals from a single-count conviction under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), contending, inter alia, that the jury's guilty verdict was not supported by sufficient evidence.  The unlawful RICO enterprise with which Muñoz was found to be associated consisted of a corrupt unit within the PRPD tasked with investigating narcotics trafficking and related crimes.  Among other abuses, many officers within this unit, including Muñoz, routinely stole money and other items during residential searches.

On appeal, Muñoz concedes that the government proved this corrupt unit was an unlawful enterprise and that he was associated with it but contends that the government failed to prove that he participated in the conduct of this enterprise "through a pattern of racketeering activity," as RICO requires.  Thus, Muñoz's appeal requires us to determine whether the government established that he committed the two predicate acts of racketeering alleged in his indictment, which were charged as extortion and extortion conspiracy under Puerto Rico law.  At bottom, Muñoz argues that his conduct in these two instances -- in which he either agreed to or did steal items from homes while executing search warrants -- did not match the elements of extortion.  Because we agree that no rational jury could have

found Muñoz guilty of extortion and extortion conspiracy, as those crimes are properly construed under Puerto Rico law, we reverse Muñoz's RICO conviction without considering his other challenges on appeal.

## I.

In July 2018, Muñoz and six others were charged with one substantive RICO violation arising from their activities as officers within the Caguas Drug Unit ("CDU") between 2014 and 2018. In addition to details about the existence of an unlawful enterprise within the CDU and the methods and means by which it operated, the indictment alleged that Muñoz participated in the enterprise's affairs by committing two specific acts of racketeering. These included one act of extortion conspiracy in May 2015 ("Racketeering Act Two"), and one act of extortion in June 2015 ("Racketeering Act Three"). The indictment alleges that both predicate acts occurred during residential search-warrant executions, in which Muñoz surreptitiously took money or jewelry for his own personal use, purportedly in violation of Puerto Rico's extortion statute, P.R. Laws Ann. tit. 33, § 4828 (criminalizing conduct by "[a]ny person who . . . under pretext of rights as a public official or employee, compels another person to deliver property").

In October 2019, Muñoz was convicted of the charged RICO violation, following a five-day jury trial. The evidence

established that the CDU was responsible for investigating drug-trafficking related crimes, which included surveillance, executing search and arrest warrants, and seizure of drugs, firearms, and drug-sale proceeds.  It further established that, between 2014 and 2018, Muñoz and other CDU officers engaged in unlawful activities to personally enrich themselves, including theft of money, drugs, firearms, and other items from the subjects of residential search-warrant executions and traffic stops.  Evidence also demonstrated that CDU officers frequently submitted false statements to obtain search warrants, conducted unlawful searches, and failed to report their stolen proceeds in warrant returns.

The government's evidence as to the scope and methods of this corruption included testimony from several former CDU officers, including two of Muñoz's co-defendants, Eric Velasquez-Martinez ("Velasquez") and Christian Rodriguez-Cruz ("Rodriguez").  In addition to describing the means and methods by which CDU officers stole money and other items, Velasquez and Rodriguez testified that about 95-to-99 percent of the search warrant applications drafted by CDU officers contained false information.  Velasquez further estimated that about 90 percent of the officers assigned to the CDU between 2012 and 2018 were generally involved in the corrupt activities described.

Both Rodriguez and another former CDU officer and co-defendant, Eidderf Jhave Ramos-Ortíz ("Ramos"), also testified

- 4 -

that "[e]verybody" in the CDU generally engaged in theft and extortion. For example, Ramos explained the typical practice among CDU officers: "if we were entering a residence to execute an arrest . . . , a search and seizure warrant or something and there was money in view, then you would just grab the money and put it in your pocket and then continue on with the search." As Rodriguez further explained, the officers conducting the search would assist each other in this endeavor. In other words, it was "previously agreed on," or generally understood, among the officers of the CDU that if one of them saw something during a search, they would take it and the other would either not interfere or help them conceal the theft. This would happen even when the subject of the search was later arrested and/or charged.

Ramos further explained another way in which officers would "steal money" from individuals on the street: "[w]e would arrive in unmarked [PRPD] vehicles to [a] . . . drug selling point, and catch the people with . . . drugs and money, and turn them around, seize the money. Sometimes we'd let them go. Sometimes we didn't." Both witnesses confirmed that, regardless of the tact employed or the item stolen -- whether it be money, drugs, or guns -- officers would divide up the profits among themselves.

As to Muñoz's involvement in the unlawful enterprise, the witnesses provided testimony about specific instances in which

Muñoz personally took money or other items during residential searches, or accepted proceeds from thefts by other CDU officers during the same. This included evidence regarding the two predicate racketeering acts attributed to Muñoz in the indictment.

For Racketeering Act Two, evidence established that, in May 2015, Muñoz and Ramos executed a search warrant at the apartment of Michael Santiago Figueroa ("Santiago") and stole a gold chain from his residence. Specifically, Ramos testified that, upon arriving at Santiago's apartment, Muñoz told Ramos to help him with the search. The two officers began by searching the bedroom, and eventually came upon a storage room in which there were tools and other items. Muñoz stood at the door of the storage room as Ramos searched a red toolbox that held a little black bag. Ramos discovered a gold chain inside the bag and told Muñoz, "[T]here's a chain [here]." Muñoz replied, "[W]ell, take it." Ramos did so and handed the chain to Muñoz, who then put it into his pocket. Ramos described this interaction as "between the two of [them]," and that no one else was present. The next day, Muñoz handed Ramos a sum of money and remarked: "so you can see how I do things." Ramos testified that he understood this money to be proceeds from Muñoz's sale of the chain and given to him so that he would reciprocate going forward by sharing any similarly ill-gotten gains with Muñoz.

The victim of this theft, Santiago, also testified at

trial. He explained that he was in the apartment for the duration of the search and arrested at its conclusion, but ultimately not criminally charged. During the search, Santiago did not see Muñoz do anything specific, other than generally "[s]earching the property." He only later discovered that the chain was missing when he returned home after being released by authorities.

For Racketeering Act Three, evidence established that, in June 2015, Muñoz and Velasquez executed a search warrant at the residence of Edwin Gonzalez Beltran ("Gonzalez"), during which Muñoz stole money from Gonzalez's kitchen cabinets. Velasquez testified that he and Muñoz were solely responsible for conducting this search, although five or six other officers were also present on the scene. As Velasquez described, the search began in the kitchen, where Velasquez discovered a plate containing crack cocaine, field-tested the drugs, and subsequently handcuffed Gonzalez, who had been seated at a table nearby. Gonzalez also provided testimony about the circumstances of this search. He explained that, upon being handcuffed, he observed Muñoz searching his kitchen cabinets. He further testified that he observed Muñoz begin to open one cabinet that contained an unspecified amount of cash and then "signal[] to" Velasquez. After this "signal," Velasquez moved Gonzalez out of the kitchen and into the bedroom to continue his own search of the residence. Gonzalez further testified that he objected to this move at the time, saying to

- 7 -

Velasquez "Why are you doing this? . . . I have to be able to see what you're doing." Gonzalez further explained that he felt Muñoz "couldn't take [the money] out right in front of [him]" because it would be "illegal." This observation was the extent of the evidence regarding Gonzalez's interactions with Muñoz during the search. Gonzalez was arrested following the search and charged with drug trafficking.

Velasquez testified that, after the search, Muñoz told him to meet him at a bar later that night. Outside the bar, Muñoz approached Velasquez and handed him $90. Upon being handed the money, Velasquez asked, "[W]hat's this," to which Muñoz replied, "[T]his is your part. . . . Your share." Muñoz then said, "[Y]ou're really blind, you know. You didn't see this," to which Vasquez further responded, "[W]here was that?" Muñoz said, "[I]n the cabinets."

At the close of the government's case, Muñoz moved for a judgement of acquittal under Rule 29, on the ground that the "government failed to present evidence sufficient to sustain [his] conviction." See Fed. R. Crim. P. 29. Specifically, Muñoz argued that evidence was insufficient to prove "both racketeering acts" because there was no evidence that he "compelled anyone to deliver property under the pretext of authority." After his motion was denied, Muñoz rested his defense without presenting evidence. He was ultimately convicted and sentenced to 60 months' imprisonment

to be followed by 36 months' supervised release.  This timely appeal followed.

## II.

In his primary challenge on appeal, Muñoz contends that the district court erred in denying his motion for acquittal.  We review preserved challenges to the sufficiency of the evidence de novo, evaluating the evidence in "the light most favorable to the verdict" and asking "whether 'that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime.'"  United States v. Torres Monje, 989 F.3d 25, 27 (1st Cir. 2021) (quoting United States v. Santos-Rivera, 726 F.3d 17, 23 (1st Cir. 2013)).  In so doing, however, "we must 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'"  United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir.1995)).  To the extent that a sufficiency challenge raises issues of statutory interpretation, our review is plenary.  United States v. Saccoccia, 354 F.3d 9, 12 (1st Cir. 2003).

## A.

To sustain a conviction for a substantive RICO violation, the government must prove, beyond a reasonable doubt, "(1) the existence of an enterprise (2) that affected interstate

commerce; and (3) that the defendant was associated with the enterprise; (4) and conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity." United States v. Brandao, 539 F.3d 44, 50-51 (1st Cir. 2008); see 18 U.S.C. § 1962(c). Here, Muñoz only challenges the government's proof as to the fifth element.

A "pattern of racketeering activity" requires proof that the defendant committed at least two racketeering acts within a ten-year period, inter alia. 18 U.S.C. § 1961(5); Brandao, 539 F.3d at 54. As relevant here, racketeering activity includes "any act or threat involving . . . extortion . . . , which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). "A substantive RICO prosecution requires, in a very practical sense, the full trial of each of the predicate acts alleged." United States v. Levasseur, 846 F.2d 786, 801 (1st Cir. 1988). In other words, the government must prove each essential element of the charges encompassed by at least two predicate acts beyond a reasonable doubt to sustain a conviction for substantive RICO. See Levasseur, 846 F.2d at 801; United States v. Carrillo, 229 F.3d 177, 183 (2d Cir. 2000) (explaining that, to support a RICO violation, the government must prove all elements of the predicate offense "as defined by state law"); see also United States v. Burhoe, 871 F.3d 1, 32 (1st Cir. 2017) (reversing RICO conviction where evidence was insufficient

- 10 -

to prove at least two predicate acts).

As discussed above, the indictment in this case alleged that Muñoz engaged in a pattern of racketeering activity through committing two predicate crimes -- (i) extortion conspiracy in May 2015, and (ii) extortion in June 2015 -- both in violation of Puerto Rico Penal Code Article 191.  In relevant part, Article 191 defines the crime of extortion as "[a]ny person who . . . under the pretext of rights as a public officer or employee, compels another person to deliver property."  P.R. Laws. Ann. tit. 33, § 4828 (official English translation); see id. § 5261 (Spanish). Conspiracy requires that "two . . . or more persons conspire or agree to commit a crime and have made specific plans regarding their participation, the time, the location, or the acts to be carried out," P.R. Laws Ann. tit. 33, § 4877 (official English translation), as well as an overt act by one or more of the co-conspirators towards carrying out the object of the unlawful agreement, id. §§ 5334, 4878 (official English translation).

On appeal, Muñoz contends that no rational jury could have found that he committed either extortion conspiracy or extortion under these definitions, because the evidence failed to prove the "compel[led] . . . delivery" element in either instance. In support of this argument, Muñoz points to the undisputed facts that his first victim, Santiago, was neither aware that the chain was being taken at the time it was stolen nor in the room when it

- 11 -

happened, and argues that his second victim, Gonzalez, did not "deliver" the money to Muñoz in the natural sense of the word. In other words, he contends that his conduct amounted only to simple theft or larceny, which are not listed among RICO's enumerated acts of racketeering, see 18 U.S.C. § 1961(1). In response, the government argues that an "active[]" or "physical[] hand over" (or agreement to affect the same) is not required to prove extortion (or extortion conspiracy). Rather, it contends that "[i]t is enough if, upon a show of authority -- here a warrant -- the victim does not resist the defendant's obtaining or taking of the property," as was purportedly the case with Santiago, or the victim is "compelled . . . to surrender control of his property," as was purportedly the case with Gonzalez.

**B.**

As both parties seem to agree that Muñoz's challenge turns on the meaning of the Puerto Rico extortion statute's use of "compels another person to deliver property," we begin with the text of the statute. See United States v. Brown, 500 F.3d 48, 59 (1st Cir. 2017) ("When interpreting a statute, we begin with its text." (citing Richardson v. United States, 526 U.S. 813, 818 (1999))). "In so doing, we accord the statutory text its ordinary meaning by reference to the specific context in which that language is used, and the broader context of the statute as a whole." United States v. De la Cruz, 998 F.3d 508, 513 (1st Cir. 2021)

- 12 -

(internal quotes and cites omitted); see also P.R. Laws Ann. tit. 33, § 4641 (instructing that "words and phrases [of the Penal Code] shall be construed according to context and the meaning sanctioned by common and current usage").  "When exhausting those [textual and structural] clues enables us to resolve the interpretive question put to us, our 'sole function' is to apply the law as we find it, not defer to some conflicting reading.'"  De la Cruz, 998 F.3d at 513 (alteration in original) (quoting Niz-Chavez v. Garland, 141 S. Ct. 1474, 1480 (2021)).

**1.**

We conclude that the ordinary meaning of the statute's use of "compels another person to deliver property" necessarily implies that the accused's taking of property must be accomplished with the victim's active acquiescence.  Indeed, the word "compel" is defined as "to force by physical necessity or evidential fact"; "to urge irresistibly by moral or social pressure"; "to force by personal temperament or other subjective considerations"; "to force or cause irresistibly: call upon, require, or command without possibility of withholding or denying"; "to domineer over so as to force compliance or submission," or "to obtain (a response) by force, violence, or coercion."  Compel, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/compel (last visited Aug. 6, 2023).  Under any of these alternative definitions, the term necessarily

- 13 -

implies that the subject of the compulsion must at least consent to the "compliance" or "command" being sought, even if unlawfully obtained, grudgingly provided, or involuntary, in the legal sense. Similarly, the transitive verb "deliver" is defined as "give, transfer: yield possession or control of: make or hand over: make delivery of."  Deliver, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/deliver  (last visited Aug. 6, 2023); see also Deliver, v.13(a), OED Online, Oxford Univ. Press., https://www.oed.com/view/Entry/49470?rskey=3m8R4g&result=2&isAdvanced=false#eid (last visited Aug. 6, 2023) (defining transitive verb, "deliver," "[i]n legal contexts," as "[t]o hand over (goods, notices, etc.) to another person legally or formally; esp. to put (property) into the legal possession of another person.").  Thus, when read in the context of the operative statute -- "compels another person to deliver property" -- the word "deliver" necessarily implies that the victim must consent to the displacement of his property, again, even if grudgingly provided. Cf.  Ocasio v. United States, 578 U.S. 282, 297 (2016) (noting that "shakedown" "payments" are necessarily made "with [the payor's] grudging consent").

At oral argument, the government conceded that this reading was correct.  Given this concession and our own textual analysis, we need not tarry with any further confirmatory

- 14 -

examination of the Puerto Rico Penal Code's legislative history or similar extortion statutes. Cf. De la Cruz, 998 F.3d at 516. Doing so would not cast any doubt on our conclusion that a consented-to taking is a necessary element of the Puerto Rico extortion statute.

Moreover, the government also conceded that, without this element of induced consent, the Puerto Rico extortion statute would not constitute a valid RICO predicate. Indeed, "for a state offense to be 'an act or threat involving . . . extortion, . . . which is chargeable under State law,' as RICO requires, see 18 U.S.C. § 1961(1), the conduct must be capable of being generically classified as extortionate." Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 409 (2003); accord Wilkie v. Robbins, 551 U.S. 537, 567 (2007); see also United States v. Kirsch, 903 F.3d 213, 221 n.9 (2d Cir. 2018) ("[I]n order for conduct to serve as a state law RICO extortion predicate act, it must (1) violate a state extortion statute and (2) satisfy the 'generic' definition of extortion."). The Supreme Court has defined "generic extortion" for these purposes as "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats," Scheidler, 537 U.S. at 409 (emphasis added) (quoting United States v. Nardello, 393 U.S. 286, 290 (1969)), which is similar to the federal definition of extortion set forth in the Hobbs Act, see 18 U.S.C. § 1951(b)(2)

- 15 -

(defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right").

In construing the federal definition of extortion, we have endorsed the view that "[c]onsent is 'the razor's edge that distinguishes extortion from robbery.'" Burhoe, 871 F.3d at 28 (quoting United States v. Cain, 671 F.3d 271, 283 (2d Cir. 2012)); see also Ocasio, 578 U.S. at 297 (noting that "consent" as used in the Hobbs Act extortion provision "is designed to distinguish extortion from robbery" (internal cites omitted)). Thus, "the essential requirement to establish extortion" under the federal definition "is [] that the victim retained some degree of choice in whether to comply with the extortionate threat, however much of a Hobson's choice that may be." Burhoe, 871 F.3d at 28 (cleaned up, quoting Cain, 671 F.3d at 283). Because Puerto Rico's definition of extortion is substantially similar to the federal definition found in the Hobbs Act in relevant part, as it must be to qualify as a RICO predicate, see Scheidler, 537 U.S. at 409, we consider cases involving Hobbs Act extortion "as persuasive analogous authority," Saccoccia, 354 F.3d at 12 n.2 (1st Cir. 2003).

**2.**

With this construction in place, we turn to the trial evidence concerning the two predicate acts of racketeering. After

careful review, we conclude that no rational factfinder could find that Muñoz either agreed to or did obtain his victims' property with their consent.  Accordingly, his conviction must be reversed.

**i.**

As to the May 2015 extortion-conspiracy charge, the evidence established only that Ramos and Muñoz agreed to take Santiago's gold chain for their own personal benefit; the evidence was insufficient, however, to support a finding that they agreed to take it without Santiago's consent.  As the Supreme Court has explained, "the fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense."  Ocasio, 578 U.S. at 287 (emphasis added, alteration in original) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)).  "In other words, each conspirator must have specifically intended that some conspirator commit each element of the substantive offense."  Id. at 292.  Puerto Rico law is no different.  See P.R. Laws Ann. tit. 33, §§ 4877, 4878 (defining conspiracy as "[w]hen two . . . or more persons conspire or agree to commit a . . . first degree or second degree felony"); see also Town v. Velez Rivera, 693 D.P.R. 649, 652 (P.R. 1966) ("[T]he [overt] act must be one conducive to the object of the conspiracy.").

Thus, Muñoz's conviction can only be sustained if the

government's evidence sufficiently established that he and Ramos agreed that at least one of them would "compel[] [Santiago] to deliver [his] property" to them, i.e., induce his consent to the displacement of his chain. We conclude that this element was not sufficiently proven. Rather, Ramos' testimony only established that Muñoz told him to "take" the chain; Ramos did so; Ramos handed it to Muñoz; and Muñoz pocketed it, sold it, and split the proceeds with Ramos, which was consistent with Ramos' expectations. Critically, however, Ramos also testified that this taking occurred "between the two of [them]." Santiago was not present in the storage room when this taking occurred and he was unaware that it was happening. Rather, Santiago only discovered that the chain was missing after he returned home from the police department. Given that the evidence of this unlawful agreement encompassed only a surreptitious taking without Santiago's awareness, no rational jury could have found that Muñoz agreed to obtain the chain with Santiago's consent. Cf. Ocasio, 578 U.S. at 287 (holding that Hobbs Act extortion conspiracy requires proof that the defendant "entered into a conspiracy that had as its objective the obtaining of property from another conspirator with his consent and under color of official right").

Nor can we conclude that the evidence sufficiently established that such an agreement was implied. In an attempt to persuade us otherwise, the government points to Ramos' description

- 18 -

of how the corrupt CDU officers would generally "steal money" during executions of residential search warrants and their general "understanding" or "agreement" as to how this would be done. The district court relied on similar evidence in denying Muñoz's Rule 29 motion. But, even if we assume, arguendo, that this background understanding can reasonably be imputed to the specific agreement between Muñoz and Ramos in May 2015, it does not reflect an accepted practice of consented-to takings. As Ramos testified, the typical practice for residential searches was that officers would simply "grab" or "take" money or items in view, "put it in [their] pocket and then continue on with the search warrant." He further testified that this would happen even where the victims were arrested and charged.

Thus, even if this general practice of unilateral, secretive takings were relevant to the specific predicate act at issue, it does not describe conduct that would constitute extortion without more. Without any details about the victims' consent to these thefts -- or at least their contemporaneous awareness from which consent can reasonably be inferred -- this testimony reflects a general practice of simple larceny. See P.R. Laws Ann., tit. 33, § 4820 ("Any person who without violence or intimidation illegally takes personal property belonging to another shall commit the crime of larceny."). Compare Camelio v. Am. Fed'n, 137 F.3d 666, 670-71, 671 n.5 (1st Cir. 1998) (affirming dismissal of

private RICO action predicated on extortion, where defendant's "unilateral acts," such as adverse union-related conduct, did not constitute extortion due to the absence of victim's consent), and Dickey v. Kennedy, 724 F. Supp. 2d 207, 214 (D. Mass. 2010) (entering summary judgment against private RICO claims predicated on health-inspector's purported extortion of property owner's buildings, where evidence established that the health-inspector "unilaterally condemned, renovated and then sold property . . . against the will of or unbeknownst of the 'victims'"), with United States v. Watson, 778 F. App'x 340, 347-49 (6th Cir. 2019) (affirming federal extortion-conspiracy conviction against corrupt police officers where evidence established that defendants "did not simply steal drugs and money," but rather that "victims agreed to give up their property so that they could escape arrest").

By contrast, Ramos also described an alternative method by which officers would steal money directly from victims at drug selling points, without a warrant, where they would simply show up, "catch the people with . . . drugs and money, . . . turn them around, seize the money . . . [and s]ometimes . . . let them go." Although conduct under these circumstances may plausibly constitute extortion, see, e.g., Watson, 778 F. App'x at 347 (affirming federal extortion conviction based on evidence that corrupt police officers "knew their drug-dealing victims would

- 20 -

fear getting arrested or injured, and [] exploited these fears to take drugs and money [directly] from them"), there is no evidence that this is what was specifically agreed upon between Ramos and Muñoz with respect to their theft from Santiago. The drug-selling-point victims' contemporaneous awareness of, or presence during, the respective takings illustrates the critical difference. That is, consent can reasonably be inferred when a victim is aware of or at least present during the taking, but the same cannot be said when property is taken unbeknownst to the victim. See Burhoe, 871 F.3d at 28-29 (describing consent for federal extortion purposes as requiring "voluntar[y] abandon[ment]" of property); 3 Wharton's Crim L. § 44:2 (16th ed., Nov. 2021 Update) (explaining that "[t]he required mental state for extortion is the intent to compel another individual to commit an act against their will").

Thus, Ramos's background testimony as to possible extortionate methods and practices used by other CDU officers in other contexts does not sufficiently prove that Muñoz agreed to obtain Santiago's chain by extortion. Given the absence of other evidence from which a rational jury could find that Muñoz conspired to extort Santiago, we must reverse his conviction on this basis alone. See Burhoe, 871 F.3d at 32 (reversing RICO conviction where evidence established "at most one racketeering act").

We further conclude that the evidence was also insufficient to prove the second predicate act of substantive extortion, arising from the June 2015 search of Gonzales's residence. Much like Muñoz's theft from Santiago, the evidence established that Muñoz took Gonzalez's money from his kitchen cabinet and outside his presence. That is, the testimony of Velasquez and Gonzalez established that Muñoz must have taken the money after Gonzalez was moved to another room and out of sight. But there was no evidence from which a rational jury could infer that Gonzalez consented to this surreptitious taking. To the contrary, Gonzalez's testimony, if anything, establishes that he did not consent to what he suspected might occur once he was removed from the kitchen, as he verbally protested this movement. Cf. Burhoe, 871 F.3d at 28-29 (reversing federal extortion conviction where victims' contemporaneous protests established that the takings were not accomplished with their consent).

Moreover, evidence that Gonzalez was aware, at the time, that the money in the cabinet would be taken was equivocal. Although his testimony supported a reasonable inference that he suspected it might happen, he was only able to confirm that the money had in fact been stolen upon later learning that it was missing and not logged in the warrant return. Because this evidence "permits two equally plausible inferences" as to

Gonzalez's contemporaneous awareness of the taking, "a reasonable jury must necessarily entertain a reasonable doubt" about whether he had such knowledge and in fact consented to the taking, particularly given his objection to being moved. Rodríguez-Martinez, 778 F.3d at 373 (internal quotes and cites omitted) ("We 'must reverse a conviction on the grounds of evidentiary insufficiency where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict.'" (quoting United States v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998))).

Nevertheless, the government contends that Gonzalez's physical detainment sufficiently establishes the "compel[led] . . . delivery" by consent, i.e., he was handcuffed and escorted out of the kitchen "so that Munoz could . . . take [the] money." In other words, it argues that it is enough that Gonzalez could "not resist" Muñoz's taking and that proof of a "physical[] hand over" is not required. To support this contention, the government cites two cases that upheld RICO convictions predicated on extortionate acts even though the extorted property was not physically exchanged hand-to-hand. See United States v. John-Baptiste, 747 F.3d 186, 202 (3d Cir. 2014); United States v. Ivezaj, 568 F.3d 88, 93-94 (2d Cir. 2009). But, even if we were to accept the proposition that requiring a physical exchange would be an "overly literal" reading of the word "deliver"

where, for example, the extorted property was intangible, see Ivezaj, 568 F.3d at 93-94, the government's alternative characterizations of Gonzalez's "surrender" or "relinquish[ment] [of] control over his property" are not supported by evidence of his consent.

In both John-Baptiste and Ivezaj, the victims' consent to the takings at issue was supportably inferred from evidence of their voluntary abandonment of the extorted property into the control of their extortionists. See John-Baptiste, 747 F.3d at 202 (affirming federal extortion conviction of police officer, where evidence established that victim placed money for bribe to retrieve her impounded car on defendant's patrol car dashboard and circumstantial evidence established that defendant kept a portion of it for herself); Ivezaj, 568 F.3d at 92-94 (affirming RICO conviction predicated, in part, on New York extortion violation, which requires "compel[led] . . . deliver[y]," where crime family "wrested control of certain illegal gambling operations" from rival family, i.e., the victim "never returned to [the] gambling clubs . . . following the [defendant's] assault").

Here, it is far too speculative to infer from Gonzalez's testimony that he knew the money was being taken at the time it occurred and that he voluntarily abandoned control of it to Muñoz. To the contrary, evidence that Gonzalez objected to being removed from the kitchen can only reasonably be interpreted as

demonstrating that he had not consented to the theft that he suspected might occur. And, to the extent Gonzalez's will and ability to prevent the taking was overborne by his detainment at Muñoz's direction, this conduct could plausibly amount to robbery, see 33 L.P.R.A. § 4826 ("tak[ing] . . . property [of] another in the immediate presence of said person and against his/her will by means of force"), but not extortion, 3 Wharton's Crim L. § 44:2 (explaining that "[t]he required mental state for extortion is the intent to compel another individual to commit an act against their will"), cf. Pueblo v. Rodríguez Berdasco, No. A1CR201900465, 2021 WL 4191392, at *8-9 (P.R. Cir. Aug. 30, 2021) (citing Wharton's in aid of construing Puerto Rico false imprisonment statute).

**3.**

Finally, we address the government's argument that the search warrants that precipitated and facilitated Muñoz's thefts provided sufficient evidence of the victims' consent to the displacement of their property. Specifically, the government contends that the victims "consented to what appeared to be a lawful search of [their] residence[s]" and thereby "relinquished control over [the] property" that was taken. Muñoz contends that applying the Puerto Rico extortion statute in this manner would be too expansive. We agree that accepting the government's argument would render "extortion" under the Puerto Rico statute too expansive to qualify as a federal RICO predicate.

The government cites no authority for this broad proposition that, for extortion purposes, the subject of a search warrant "consents" to the displacement of any of their property simply by virtue of submitting to the execution of the warrant. In any event, even if we accepted the argument that a warrant's execution results in a consented-to taking of sorts, such consent could only reasonably encompass items within the scope of the warrant. Cf. United States v. Stierhoff, 549 F.3d 19, 24 (1st Cir. 2008) ("The scope of a consensual search is generally defined by its expressed object, and such a search may not exceed the scope of the consent given."). Here, the record is bereft of any evidence that the search warrants Muñoz utilized purported to authorize the seizure of the specific items that were taken. Thus, no rational jury could conclude that the warrants themselves induced the victims' consent to the displacement of the property that Muñoz took. If anything, the warrants could have only plausibly induced the victims' consent to the searches themselves and the seizure of the contraband identified in the warrants, not the theft of any and all property that the searching officers were to come upon while executing the search. Thus, we reject the government's contention that the search warrants themselves coupled with the victims' acquiescence to that general show of authority provided sufficient evidence of their consent to the allegedly extortionate takings, which were unbeknownst to them at

the time they occurred.

### III.

Having determined that Muñoz's conviction rests on insufficient evidence that he committed at least two predicate acts of racketeering, we need not reach his other evidentiary and sentencing challenges on appeal.  For the reasons discussed above, we **reverse** his conviction and remand for disposition consistent with this opinion.